UNITED STATES of America,
Plaintiff-Appellant,

v.

Erle W. McGOUGH,
Defendant-Appellee.

No. 74–1035.

United States Court of Appeals,
Fifth Circuit.

March 31, 1975.

**600**

John L. Briggs, U. S. Atty., Jacksonville, Fla., William J. James, Jr., Claude H. Tison, Jr., Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellant.

Charles Luckie, Tampa, Fla., E. B. Larkin, Dade City, Fla., for defendant-appellee.

Before BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

## I. FACTS

Erle W. McGough, the vice president and general manager of the Withlacoochee River Electric Cooperative (the Cooperative), was indicted on May 16, 1973, by a federal grand jury on four counts of violating 18 U.S.C. § 1001[1] by filing four false financial statements on behalf of the Cooperative with the Rural Electrification Administration (REA). The indictment charged that the financial statements, which were filed on January 20, 1969, February 10, 1970, February 8, 1971, and July 23, 1971, were knowingly false in that McGough had understated the amount of the Cooperative's accounts receivable on each of them.

The government's charges that the accounts receivable were understated were based upon alleged misappropriations of Cooperative funds by McGough. The government contends that McGough's alleged embezzlement created a debt from him to the Cooperative, and that the existence of that debt should have been carried on the Cooperative's financial statements as an "account receivable." The amounts involved in individual instances of embezzlement were aggregated to arrive at the alleged amount of the understatement. Thus, the first count alleged an understatement of $44,438.17, based on transactions occurring as early as November 12, 1959, and up to December 31, 1968, the end of the twelve-month period covered by the financial statement filed with the REA on January 20, 1969. The second count alleged an understatement of approximately $49,000, representing the $44,000 understatement on the statement for 1968, plus $5,000 allegedly misappropriated during the twelve-month period ending December 31, 1969. The third and fourth counts similarly aggregated the

---

1. Title 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

amount of the understatement. As alleged in count four, it totalled $59,014.90.

McGough's alleged misuse of Cooperative funds came to the attention of the REA in May 1971, when it received unverified information that McGough had arrangements with automobile dealers in Brooksville, Florida, under which he had received automobiles from the dealerships at virtually no cost to himself, while the prices of cars purchased by the Cooperative were inflated to make up the difference. The matter was referred to the Office of the Inspector General, Department of Agriculture (OIG), which thereupon launched a detailed and extensive investigation into the Cooperative's financial affairs. This investigation uncovered numerous other suspected irregularities, including the falsification of expense account claims and the personal use of Cooperative equipment and employees by McGough. In November 1971 the REA notified the Cooperative's Board of Directors of the investigation and its findings thus far, although the investigation was not then complete. McGough was present and represented by two attorneys at the meeting held for this purpose. Several days later he was suspended with pay from his job as general manager of the Cooperative, and in January 1972, he was fired.

In the meantime, the Florida state authorities had begun to take an interest in the situation. McGough was eventually indicted by the state on a total of seventeen counts of grand larceny based upon several of the transactions underlying the federal § 1001 prosecution. A number of the state's charges were eventually dismissed. McGough was acquitted on four charges in July 1972. He was found guilty after another trial in October 1972, on charges arising from his deal with the Brooksville automobile dealers. In October 1974, while this case was being appealed, the Florida Supreme Court reversed McGough's state court conviction holding that the evidence was insufficient to prove McGough's guilt beyond a reasonable doubt.

The federal investigation by the OIG continued throughout most of the period during which McGough was standing trial on the state charges. The OIG's final investigative report was referred to the United States Attorney in August 1972. The government concedes that it did not pursue indictments against McGough then because it was aware of the state prosecutions pending against him and it wanted to await the outcome of those prosecutions before deciding whether federal prosecution was justified. The decision to prosecute was made in November 1972, after McGough decided to appeal the state court conviction, but the matter was not taken to the federal grand jury until May 1973. After the return of federal indictments, the case was set for trial in September 1973, then reset for December 1973 on motion of the trial court. On November 2, 1973, McGough filed a motion to dismiss the indictment, alleging either a violation of his right to a speedy trial under the Sixth Amendment or a deprivation of due process under the Fifth Amendment by virtue of the delay. He alleged numerous grounds for prejudice resulting from the government's delay, including the death of several witnesses. The trial court granted the motion to dismiss the indictment on November 28, 1973, ruling that the indictment was fatally defective in its failure to sufficiently allege materiality, an essential element of a § 1001 offense. In addition, the court determined that an unusual combination of factors and circumstances warranted the evocation of the due process clause to insulate McGough from further prosecution by the United States for the offenses charged in the indictment.

The government instituted this appeal from the order dismissing the indictment, pursuant to 18 U.S.C.A. § 3731 (Supp.1975). For the reasons discussed below, we hold that the trial court erred in holding that the indictment was insufficient and in its application of the due process clause to the facts of this case.

## II. MATERIALITY

The district court dismissed the indictment against McGough for its failure to explicitly allege the materiality of the

false document, or to allege facts sufficient to show materiality, relying on Gonzales v. United States, 286 F.2d 118, 121 (10th Cir. 1960), cert. denied, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190, a case very similar to this one in its underlying facts. During the course of two oral hearings on McGough's motion to dismiss, the district court expressed great concern over the ultimate question of whether the charges against McGough met the materiality requirement of a § 1001 offense as a matter of law. However, its order of dismissal was explicitly based solely on the facial insufficiency of the indictment's allegation of materiality.[2] Thus we have before us only the narrow preliminary question of whether materiality was sufficiently alleged in the indictment, not the question of whether McGough's understatement of the Cooperative's accounts receivable is, as a matter of law, a materially false representation to the government.[3]

▮▮ The "false writing or document" portion of § 1001 under which McGough was indicted does not contain the word "material," but this court has held that materiality is an essential element of every § 1001 violation. Rolland v. United States, 200 F.2d 678 (5th Cir. 1953), cert. denied, 345 U.S. 964, 73 S.Ct. 950, 97 L.Ed. 1383. Therefore it is necessary, in order to state an offense, that the indictment either expressly allege materiality or otherwise indicate that the falsity charged is allegedly material. In the context of § 1001, materiality means that the false statement must have a natural tendency to influence, or be capable of affecting or influencing, a

government function. United States v. Krause, 5th Cir. 1975, 507 F.2d 113; Freidus v. United States, 96 U.S.App. D.C. 133, 223 F.2d 598, 601 (1955). The statement or representation need not have actually influenced an action of a government agency. Gonzales v. United States, 286 F.2d 118, 122 (10th Cir. 1960), cert. denied, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190.

▮▮ The proper question to ask, therefore, in determining whether an indictment sufficiently alleges materiality is whether the statement or representation alleged to be false could conceivably have a tendency or capacity to influence or affect a government function; that is, whether it is potentially capable of being proved material by the government at trial. If the facts alleged in the indictment warrant an inference that the false statement is material, the indictment is not fatally insufficient for its failure to allege materiality *in haec verba*. Dear Wing Jung v. United States, 312 F.2d 73 (9th Cir. 1962). The district court however, appears to have applied an unrealistically harsh standard in determining the sufficiency of this indictment's allegation of materiality. Relying upon the language from *Gonzales, supra*, 286 F.2d at 121, which states that a § 1001 indictment which does not expressly allege materiality must allege facts sufficient to "show" materiality, the district court apparently viewed it as necessary for the indictment to allege an array of facts which would enable it to conclusively determine whether the false statement was material.[4]

**2.** The reason given by the district court for the dismissal was influenced by the district court's desire to preserve the government's right to appeal the dismissal under 18 U.S. C.A. § 3731 (Supp.1975). A ruling in McGough's favor that the false statement was not material as a matter of law, if based upon extraneous facts outside the face of the indictment, would have raised serious questions of appealability. *See* United States v. Brewster, 408 U.S. 501, 506, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); United States v. Sisson, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970); United States v. Southern Railway

Co., 485 F.2d 309 (4th Cir. 1973). The record of the oral hearings reflects the court's awareness of this fact, and that it "hope[d] and encourage[d] the Government to appeal."

**3.** Whether the understatements alleged here were material as a matter of law is a question which should only be resolved after consideration of facts and testimony to be adduced at trial on remand. As an appellate court, we decline to consider this difficult question in this case without a full trial record.

**4.** Noting that the indictment did not allege materiality *in haec verba*, the court stated,

■ The word "show" in *Gonzales* is indeed misleading in that it fails to draw a clear distinction between an allegation of materiality and proof of materiality.[5] A clearer statement of the requirement, and the approach we follow here, is that stated in Bins v. United States, 331 F.2d 390, 392 (5th Cir. 1964), that the indictment need only allege materiality "in substance."

The four counts of the indictment in this case are admittedly terse. However, each count clearly identified the specific financial statement involved, the specific item which is alleged to be false, the specific manner in which the item is alleged to be false, i. e., an understatement, and the amount of each understatement.

The REA, to whom these financial statements were submitted, subsidizes the furnishing of electric power to rural areas where private utility companies may find it uneconomical to operate. 7 U.S.C. § 901 et seq. This is accomplished by the making of low interest, long term loans of public money to nonprofit cooperative associations, often thinly capitalized.[6] As security for these high risk loans, the REA takes a mortgage on the entire assets of these cooperatives, and is authorized to take reasonable steps to protect the public investment. The requirement of a periodic financial statement from the cooperatives, a standard term of the mortgage to the REA, is one such safeguard.

■ Examining the facts alleged in McGough's indictment, and putting them in this historical context, it is apparent to us that four consecutive understatements ranging from $44,000 to $59,000 are significant misrepresentations in a cooperative's financial statement. They could conceivably have a capacity to influence the REA's proper governmental function of overseeing the status of the security for a large public investment. This is sufficient to make out, in substance, a facial allegation of the materiality of the false writings and documents McGough is alleged to have submitted to the REA.

## III. DUE PROCESS

In addition to dismissing the indictment against McGough, the district court held that McGough was "constitutionally insulated from further prosecution with respect to the offenses which were defectively charged," because in its opinion, the "totality of the circumstances" amounted to a denial of due process. In reaching this conclusion, the trial court applied a vague due process rationale, stating that "the peculiarities and rarities and unusual circumstances attendant to this case" amounted to a denial of due process when considered cumulatively.

The facts comprising the "totality of the circumstances" are set forth fully in Part I, *supra*. The factors cited by the district court, none of which independently would have constituted a denial of due process in its view, were: the "unique and strained application" of § 1001 to the facts of this case, by virtue of the government's underlying theory; the fact that that theory entailed the aggregation of approximately 150 transactions, dating back over a period of several years; a relatively short deliberate delay by the government between August 1972 and November 1972 pending the outcome of McGough's trial on state charges; and "actual prejudice" stem-

"nor is that fatal omission cured by the allegations of any ultimate facts from which the Court could, by inference or other determination, perform its function in deciding whether the falsity alleged was or was not material."

5. This Circuit has, on at least one occasion, followed *Gonzales* in judging the sufficiency of an allegation of materiality, United States v. Satterfield, 411 F.2d 602 (5th Cir. 1969). *Satterfield* does not discuss the ambiguity in *Gonzales* which we have pointed out here.

However, since *Satterfield* upheld the sufficiency of the indictment in question there, we think it is fair to assume that *Satterfield* is consistent with the emphasis we put here on allegation as opposed to proof of materiality in an indictment.

6. The Withlacoochee Cooperative, for example, obtained federal loans at two per cent interest. Its debt-equity ratio was in excess of 80%–20%.

ming from a lengthy time lapse from the date of the first of the underlying transactions to the date of the indictment.

McGough has strongly urged upon us that the due process issue involved here is not merely whether prejudicial delay has occurred, but whether, as the district court held, the "totality of the circumstances" operates to breach a due process concept of fairness. McGough's argument, however, must be viewed in the context of the myriad of cases which have dealt with alleged prejudice resulting from a time lapse between the commission of the offense and the government's indictment or prosecution therefor. All of the factors cited by the district court are permeated with delay or staleness considerations.[7]

■ The delay which McGough complains of occurred prior to both arrest and indictment on the federal § 1001 charges. In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court held that the Sixth Amendment guarantee of a speedy trial has no application until a putative defendant becomes an "accused," by arrest, indictment or information. *Id.* at 313, 92 S.Ct. 455. The primary protection against undue government delay prior to that time is the applicable statute of limitations. United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); United Stats v. Smith, 487 F.2d 175, 177 (5th Cir. 1973). In *Marion*, the Supreme Court made it clear that when preindictment delay is asserted, actual prejudice and not merely "the real possibility of prejudice inherent in any extended delay," *id.*, 404 U.S. at 326, 92 S.Ct. at 466, is a necessary element which must be shown before the restraints of the due process clause will be applied to bar a prosecution because of a delay.

McGough's assertion of actual prejudice to his defense is based primarily upon the death of some six potential defense witnesses. Some of these witnesses, McGough claimed, would have testified as to firsthand knowledge of several of the transactions which entered into the government's calculation of the amount understated; the testimony of others might impeach government witnesses. The government, on the other hand, vigorously contested that the deaths of these six potential defense witnesses had been shown to be actually prejudicial to McGough. In fact, the government asserted at the hearings that it had expected two of them to be government witnesses, rather than witnesses for the defense.

■ We have carefully examined the transcript of the oral hearings held below, and can find no indication that the trial court weighed the contradictory factual assertions before stating that there was actual prejudice. Rather, the court seemingly viewed the prejudice to the defense to be inherent in the delay. It stated, "[N]ot only have some witnesses died, but I think the Court could almost judicially notice, in view of the size of the transactions individually and their age, that the witnesses that remain would have poor or dim memories, and that records could not be located for the same reason." "A general allegation of loss of witnesses and failure of memories is insufficient to establish prejudice." United States v. Zane, 489 F.2d 269, 270 (5th Cir. 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974).

■ The record simply will not support a factual conclusion that McGough has been actually prejudiced, nor did the district court purport to have made such a finding of fact. It merely accepted McGough's speculative and disputed allegations of prejudice and labeled them actual prejudice. This does not meet the clear requirement of *Marion* that actual prejudice be shown. "Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process

---

7. Much of the staleness stems from the government's novel and highly unusual theory of the case. We view it as inappropriate to even consider at this juncture the merits of that theory, since the government has had no opportunity to present the facts and evidence upon which it is based.

claims are speculative and premature." *Marion, supra,* at 326, 92 S.Ct. at 466.

For the reasons discussed above, the order of the district court is reversed, and the case is remanded for a prompt trial.