**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert L. STEELE,**
**Defendant–Appellant.**

**No. 87–4083.**

United States Court of Appeals,
Sixth Circuit.

Reargued Dec. 5, 1990.

Decided May 21, 1991.

---

David A. Nelson, Circuit Judge, filed concurring opinion.

Wellford, Senior Circuit Judge, filed concurring opinion.

Bailey Brown, Senior Circuit Judge, filed dissenting opinion in which Keith, Nathaniel R. Jones and Krupansky, Circuit Judges, joined, and in which Merritt, Chief Judge, and Boyce F. Martin, Jr., Circuit Judge, joined through separate dissenting opinions.

Arnold Morelli (argued), Bauer, Morelli & Heyd Co. LPA, Cincinnati, Ohio, for defendant-appellant.

Robert C. Brichler, Asst. U.S. Atty., Cincinnati, Ohio, James A. Braton (argued), Robert E. Lindsay, Shirley D. Peterson, Washington, D.C., for plaintiff-appellee.

Before MERRITT, Chief Judge, KEITH, KENNEDY, MARTIN, JONES, KRUPANSKY, MILBURN, GUY, NELSON, RYAN, BOGGS, NORRIS, and SUHRHEINRICH, Circuit Judges, and BROWN and WELLFORD *, Senior Circuit Judges.

KENNEDY, Circuit Judge.

The issue presented to the en banc court is whether the submission of false documents to the Internal Revenue Service by defendant, who was not a suspect, in response to an inquiry by an IRS agent during the course of a criminal investigation, is a prosecutable offense under 18 U.S.C. § 1001. Defendant urges us to adopt the judicially-created "exculpatory no" exception adopted by several other circuits to limit the application of section 1001. We decline to apply the doctrine to the facts in this case and find it unnecessary to decide whether the doctrine is viable in other circumstances.

## I.

### A.

Robert Steele ("defendant") was indicted and subsequently convicted on four counts: conspiring to defraud the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 371; filing a false 1981 U.S. Partnership Income Tax Return in violation of 26 U.S.C. § 7206; filing a false 1981 Form 1040 Individual Income Tax Return in violation of 26 U.S.C. § 7206(1); and knowingly submitting false documents to the IRS in violation of 18 U.S.C. § 1001. On appeal, this Court

* The Honorable Harry W. Wellford assumed senior status on January 21, 1991.

affirmed defendant's convictions on the first three counts but reversed his conviction based on 18 U.S.C. § 1001. *United States v. Steele*, 896 F.2d 998 (6th Cir. 1990). This Court then granted the government's petition for a rehearing en banc thus vacating the opinion and judgment of the appellate panel. However, no member of the en banc court has any disagreement with the panel's affirmance of the first three counts. The Court therefore adopts the panel's opinion on the issues related to those counts.

### B.

Defendant, a certified public accountant and member of an accounting firm, devoted most of his time to various business interests, including construction, oil and gas exploration, motel operations and residential developments. In May 1981, defendant formed a partnership, called Woodland Heights, with his wife, his accounting partner, Danny Pelphrey, and Pelphrey's wife. The partnership acquired a tract of land for the purpose of subdividing it and selling the parcels. In June 1981, defendant met with Thomas Duerr ("Duerr") to discuss the sale of two parcels of the subdivided tract. Duerr agreed to pay defendant $40,000 per parcel, but noted that this would create problems with the IRS because he derived his income illegally—selling controlled substances—and his income tax returns showed an annual income between $12,000 and $15,000. In light of this problem, defendant and Duerr agreed upon a purchase price of $40,000 per parcel, but the sales documents were drafted to reflect a purchase price of $20,000 per parcel. None of these documents revealed the full $80,000 purchase price for the parcels. Duerr made payments according to the

terms of these sales contracts and paid defendant $40,000 cash. Defendant paid $19,500 of this cash payment to the Pelphreys as their share of the proceeds from the sale and kept $20,500 himself.

On March 22, 1982, defendant filed a U.S. Partnership Tax Return for the taxable year 1981 on behalf of the Woodland Heights partnership. Defendant did not report the $40,000 cash payment from Duerr as partnership income. Nor did defendant report his share of the $40,000 payment on his personal income tax return.

In August 1985, Duerr was indicted on various drug charges. At this time the IRS was investigating Duerr for possible fraudulent evasion of tax liability. IRS Special Agent Hall ("Hall") called defendant on two occasions. On the second occasion in early November, Hall explained the nature of the investigation against Duerr and requested information concerning the purchase of the two parcels of land by Duerr from Woodland Heights in 1981. Defendant was not a suspect in this investigation.[1] Defendant told the agent that he had to go out of town but that he would send Hall copies of all documents relating to the sale of this property.

Immediately thereafter, defendant met with Duerr. Defendant described Hall's visit and requests, and sought assurances from Duerr that he would represent that the transaction occurred as reflected in the false sales documents. Upon receiving these assurances from Duerr, defendant told Duerr that he would send the documents to Hall and thereafter avoid contact with the agent. Defendant thereupon sent the documents which are the basis of the section 1001 count to Hall.

---

**1.** Agent Hall contacted Steele on two separate occasions. Hall, when asked the reason for initially contacting Steele, testified "that at that time we were investigating Mr. Duerr's finances" and that he recontacted Steele in order to get information to present the case against Duerr to the jury if Duerr did not plead guilty. Hall testified that even when he received the records he did not know that the $30,000 recited in the documents, part of the payment for the properties, was in cash. From this it is fair to infer that he did not yet have Duerr's confession

implicating defendant. Moreover, the exculpatory no issue in the District Court was raised by motion at the close of the government's case. During argument on the motion, the Assistant United States Attorney represented to the District Court that Steele was not the target of any investigation. The statement was not challenged. Thus, there is no evidence in the record that Steele was the target of any investigation when he was contacted on either occasion and the evidence in the record indicates that a different purpose led to these contacts.

Duerr subsequently cooperated with the government, disclosing the fraudulent nature of the land transactions conducted between himself and defendant. Had Duerr not supplied this information it was unlikely that the IRS would have learned the true amount of the transaction.[2]

## II.

### A. Section 1001

The language of section 1001 is the starting point for our analysis. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Any limitation imposed on the application of this section—whether we label it an "exculpatory no" exception or something else—must result from an analysis of the statutory language and legislative history in light of accepted canons of statutory construction. The plain meaning of the statute controls our interpretation, "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters,' " *id.* at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *Bradley v. Austin,* 841 F.2d 1288 (6th Cir.1988), or when the statutory language is ambiguous, *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). We are also mindful that this is a criminal statute, and as such, it will be strictly confined within the fair meaning of its terms. *But see United States v. Bramblett,* 348 U.S. 503, 510, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955) (stating that this canon of construction "does not mean that every criminal statute must be given the narrow-

est possible meaning in complete disregard of the purpose of the legislature").

18 U.S.C. § 1001 states:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The Supreme Court has noted that this language is broad—applying to *any* matter within *any* department or agency—and has rejected the limitation adopted by the Eighth Circuit to exclude statements made to the FBI because the FBI lacked jurisdiction to dispose of the problem. *United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984). The Eighth Circuit concluded that the phrase " 'within the jurisdiction' " referred to " 'the power to make final or binding determinations.' " *Id.* at 477, 104 S.Ct. at 1945 (quoting *Friedman v. United States,* 374 F.2d 363 (8th Cir.1967)). The FBI therefore lacked jurisdiction because it had " 'no power to adjudicate rights, establish binding regulations, compel the action or finally. dispose of the problem giving rise to the inquiry.' " *Id.* at 478 (quoting *Friedman,* 374 F.2d at 368). The Supreme Court disagreed with this construction and concluded that this term should not be given " 'a narrow or technical meaning.' " *Id.* 466 U.S. at 480, 104 S.Ct. at 1946 (quoting *Bryson v. United States,* 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969)). The "jurisdiction" of section 1001 is co-extensive with the statu-

---

**2.** In his testimony, Agent Hall negated the possibility of discovering the fraudulent nature of this transaction through investigative means exclusive of Duerr's confession. Agent Hall stated that Steele's and the partnership's federal tax returns were unhelpful. Similarly, the documents involved in this transaction, including the partnership's deposit slip, the cognovit notes, the cashiers' checks given to the partnership by Duerr, and the land contracts and deed

publicly on file, provided no means of uncovering the instant fraud. Indeed, Agent Hall testified that the documents given by Steele to Hall are consistent with the $40,000 purchase price allegedly paid by Duerr for the two parcels. Given the breadth of Hall's testimony on this subject, it is reasonable to infer that the fraud would have gone undiscovered without the aid of Duerr.

tory basis for the authority of an agency—in the case of *Rodgers,* the FBI—to conduct an investigation triggered by a defendant's false statements. Such a construction is in keeping with Congress' purpose to protect the "myriad governmental activities." *Id.*[3] Accordingly, the language of section 1001 and *Rodgers* do not limit the scope of this statute; rather, both counsel for a broad reading. *Id.* at 484, 104 S.Ct. at 1948 (stating that "[r]esolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress").

The legislative history does not communicate a congressional intent to restrict the scope of section 1001. The origin of section 1001 is discussed in *Bramblett,* 348 U.S. at 503, 75 S.Ct. at 505. Its predecessor originally covered false claims against the government by military personnel. False statements made for the purpose of obtaining the approval of such claims were also prohibited. Later, the statute was extended to include all false claims made for the purpose of cheating or defrauding the government of the United States as well as false statements for obtaining payment of a false claim. In 1934, the Secretary of the Interior sought an amendment so that he could prosecute "hot oil" frauds—frauds perpetrated by petroleum producers through falsification of interstate shipment documents but which involved no pecuniary or property loss to the government. *United States v. Gilliland,* 312 U.S. 86, 92, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941). This amendment implemented the congressional intent to expand the scope of the statute "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *Id.* at 93,

61 S.Ct. at 523. In 1948, the statute took its present form. False claims were severed and are covered by section 287; the false statements provisions were incorporated into section 1001. Hence, the legislative history communicates a congressional intent to expand, not limit, the scope of section 1001. In light of this congressional intent, a broad reading of section 1001 would not arrive at a result "demonstrably at odds" with congressional intent; to the contrary, the Court has consistently indicated that the statute should be construed broadly. *See Bramblett,* 348 U.S. at 503, 75 S.Ct. at 505 (stating that "[t]here is no indication in either the committee reports or in congressional debate that the scope of [section 1001] was to be in any way restricted").

▇▇▇▇ In its present form, section 1001 consists of three operative clauses: the first clause prohibits a misstatement of "material" fact; the second clause prohibits a false "statement" or "representation"; and the third clause prohibits false writings containing a false "statement" or "entry." A literal application of this statute requires a finding of materiality in the first clause, and a finding of a "statement" in the second and third clauses with no requirement of materiality. In keeping with prior caselaw, we choose to read the requirement of materiality into all of the clauses so as " 'to exclude trivial falsehoods from the purview of the statute.' " *United States v. Chandler,* 752 F.2d 1148, 1151 (6th Cir.1985) (quoting *United States v. Abadi,* 706 F.2d 178 (6th Cir.1983)); *United States v. Beer,* 518 F.2d 168 (5th Cir.1975); *United States v. Stark,* 131 F.Supp. 190 (D.Md.1955).[4] Accordingly, five elements comprise the section 1001 offense: (1) the defendant made a statement; (2) the statement is

---

3. The Court also rejected the Eighth Circuit's attempt to limit the application of section 1001 by reliance on the social policy of open communication by the public to the FBI. The Court concluded that " 'individuals acting innocently and in good faith, will not be deterred from voluntarily giving information or making complaints to the F.B.I.' " *Rodgers,* 466 U.S. at 483, 104 S.Ct. at 1948 (quoting *United States v. Adler,* 380 F.2d 917, 922 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967)).

4. Defendant argues that a distinction should be made between written and oral statements for purposes of section 1001 analysis. The Supreme Court has held, however, that there is no distinction between written and oral statements under this section, *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), thereby making the interpretation of "statement" equally applicable to all three operative clauses.

false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency. *Chandler,* 752 F.2d at 1150.[5]

**▮▮▮** A statement is material for purposes of section 1001 if it has a "natural tendency to influence, or be capable of affecting or influencing," a function entrusted to a governmental agency. *United States v. McGough,* 510 F.2d 598, 602 (1975); *Chandler,* 752 F.2d at 1151. It is not necessary to show that the statement actually influenced an agency, but only that it had the capacity to do so. *McGough,* 510 F.2d at 602; *Chandler,* 752 F.2d at 1151. A materiality determination is subject to *de novo* review on appeal. *Chandler,* 752 F.2d at 1151.

**▮▮▮** Here there can be little doubt as to the materiality of the false statements in the documents defendant gave to the IRS. Hall's testimony indicates that had it not been for Duerr's cooperation, the IRS would have accepted them as true. They were the type of documents on which the IRS would be likely to rely. They were not spontaneous, emotional disclaimers uttered by a suspect to which an experienced investigator would give little credence and on which one would be unlikely to rely. They were provided after a period of deliberation during which defendant discussed his plan

of deception with his co-conspirator Duerr. The documents were calculated to influence and were likely to influence the action of the IRS. The function of the IRS to collect Duerr's taxes would be impaired if the documents were accepted as accurate representations of the parties' transaction. The requirement of materiality is met under these circumstances.

**B. The Exculpatory No Exception**

Defendant argues that the "exculpatory no" exception is a necessary limitation upon the broad scope of section 1001, and as applied to the facts of the instant case, this exception exonerates him. The exculpatory no exception appears to have been first adopted by a court of appeals in *Paternostro v. United States,* 311 F.2d 298 (5th Cir.1962). That court noted that defendant "did not aggressively and deliberately initiate any positive or deliberate statement calculated to pervert the legitimate functions of government" and concluded that section 1001 did not apply. *Id.* at 309. Defendant was accused of making false statements to an IRS agent investigating unreported income from police graft. He gave negative answers to a number of questions. Following earlier district court opinions that concluded such negative answers were not statements within the contemplation of section 1001, *id.* at 302–03, the *Paternostro* court dis-

---

5. The dissent states that the majority opinion fails to specify defendant's criminal conduct and then proceeds to assume incorrectly that we consider it to be "the act of sending documents to Agent Hall...." The dissent attacks this interpretation imputed to the majority because it fails to account for the statutory term "use." According to the dissent, to "use" a writing, and thus violate section 1001, a defendant must make a representation, either explicitly or implicitly, that a document is correct as to the assertions it makes. The dissent argues that no such representation was made in this case; defendant simply sent the requested documents without making any representations.

The dissent interprets too narrowly both the majority opinion and section 1001. In our view, a defendant "uses" a writing in a manner proscribed by section 1001 when all of the elements of this section are proven: knowingly and willfully submitting a false and material document to an agency on a matter that is

within the jurisdiction of such agency. Subsumed in the elements cited by the majority, particularly the mens rea and materiality elements, is the requirement that such conduct amount to a representation to an agency regarding a document's veracity. Inherent in the finding that a document is "material" is the conclusion that a document, based either on its own characteristics or surrounding circumstances, makes a representation and possesses indicia of reliability as to its veracity. The dissent is incorrect to the extent that it would require proof of an additional element beyond those enumerated in the majority opinion, that is, that a defendant must intend to or actually represent to an agency that the facts contained in the submitted documents are correct. Our reading of the elements required to prove a section 1001 violation addresses the concerns raised by the dissent and renders superfluous proof of this additional requirement.

missed that count of the indictment. On rehearing, the court restated its holding that "the 'exculpatory no' answer without any affirmative, aggressive or overt misstatement on the part of defendant does not come within the scope of the statute...." *Id.* at 309. Later Fifth Circuit cases stated that the doctrine was based both on the purpose of the statute and the fifth amendment right against self-incrimination. The Fifth Circuit held therefore that the doctrine did not apply when a person attempts to affirmatively mislead a government investigator. *Id.* at 298. Defendant does not contend he could come within *Paternostro* 's exception that a simple "no" answer is not a statement. Thus we need not decide the applicability of the statute to that situation.[6]

 Defendant urges this Court to adopt the exculpatory no exception established by the Ninth Circuit, *see United States v. Equihua–Juarez*, 851 F.2d 1222 (9th Cir.1988), and adopted by the Fourth Circuit in *United States v. Cogdell*, 844 F.2d 179 (4th Cir.1988). This test consists of five parts:

1) the false statement must be unrelated to a claim to a privilege or a claim against the government;

2) the declarant must be responding to inquiries initiated by a federal agency or department;

3) the false statement must not impair the basic functions entrusted by law to the agency;

4) the government's inquiries must not constitute a routine exercise of administrative responsibility; and

5) a truthful answer would have incriminated the declarant.

*Equihua–Juarez*, 851 F.2d at 1224.

We decline to adopt this test for several reasons. First, some of the criteria are based on rationales which we are unable to accept. For example, the fourth and fifth criteria are premised on fifth amendment concerns. While no court has held that section 1001 violates the fifth amendment, these criteria purportedly safeguard against the application of section 1001 in circumstances which come "uncomfortably close" to violating the fifth amendment. *United States v. Alzate–Restreppo*, 890 F.2d 1061 (9th Cir.1989) (Patel, J., and Nelson, J., concurring in the judgment); *United States v. Myers*, 878 F.2d 1142, 1144 (9th Cir.1989); *United States v. Tabor*, 788 F.2d 714, 719 (11th Cir.1986); *United States v. Rose*, 570 F.2d 1358, 1364 (9th Cir.1978). This rationale assumes that section 1001 creates a Hobson's choice for an individual: admit guilt or be charged with a felony offense. *See Cogdell*, 844 F.2d at 185 (stating that "[t]he statute ... was not intended to compel persons suspected of crimes to assist criminal investigators in establishing their guilt").

 Fifth amendment concerns, however, fail to justify the fourth and fifth criteria of this test. An individual has a constitutional privilege against self-incrimination, but he has no constitutional right to give an untruthful statement. *Bryson v. United States*, 396 U.S. 64, 74, 90 S.Ct. 355, 361, 24 L.Ed.2d 264 (1969) (stating that "[a] citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood"); *Cogdell*, 844 F.2d

**6.** The First Circuit in dicta also has approved an exception for mere negative responses to government inquiries in *United States v. Chevoor*, 526 F.2d 178 (1st Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). It reasoned that "negative, oral responses to the questioning.... were not 'statements' within the meaning of 18 U.S.C. § 1001." *Id.* at 184. The Second Circuit, in declining to apply the exception where defendant made affirmative representations, stated that if it did adopt the exception, "we would construe it narrowly, ruling that any statement beyond a simple 'no' does not fall within the exception." *United States v.*

*Capo*, 791 F.2d 1054, 1069 (2d Cir.1986) (citations omitted). The principle underlying this exception is that a simple negative response cannot serve as proof of the requisite knowledge and willfulness required to convict under section 1001 absent affirmative steps by the government to make reporting requirements known. *See United States v. King*, 613 F.2d 670, 675 (7th Cir.1980) (distinguishing *United States v. Bush*, 503 F.2d 813 (5th Cir.1974), because defendant did not merely give simple negative exculpatory answers and defendant initiated the contact with the government).

at 186 (Wilkins, J., dissenting in part). The Hobson's choice posited by some courts applying this exception is flawed; an individual need not assist an investigating officer or face felony charges. A third option is available to an individual: remain silent and invoke the fifth amendment privilege against self-incrimination, *id.* at 187 (Wilkins, J., dissenting in part), or here, simply not mail the documents. While we acknowledge the canon of construction that allows a court to construe a statute so as to avoid a constitutional infirmity, *DeBartolo Corp. v. Florida Gulf Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), a statute that comes "uncomfortably close" to a constitutional violation does not trigger the application of this canon.

We also conclude that the fourth criterion fails to account for the Supreme Court's guidance in *Rodgers*. The Supreme Court expressly recognized that "[a] criminal investigation surely falls within the meaning of "any matter'...." *Rodgers*, 466 U.S. at 479, 104 S.Ct. at 1946. Thus, a distinction between an agency's administrative and investigative functions is unwarranted. There is no reason to undertake the superfluous analysis required by the fourth prong of this test because section 1001 applies to all agency actions, criminal or otherwise.[7] *See United States v. Payne*, 750 F.2d 844, 863 n. 21 (11th Cir.1985) (rejecting the administrative/investigative distinction because it is unhelpful).

In sum, we share the concerns of other courts concerning the sweeping language of section 1001. As one court noted, "[I]f

read literally, [this statute] could make 'virtually any false statement, sworn or unsworn, written or oral, made to a Government employee ... a felony.' " *United States v. Medina de Perez*, 799 F.2d 540, 543–44 (9th Cir.1986) (quoting *United States v. Bedore*, 455 F.2d 1109, 1110 (9th Cir.1972)). Yet, we do not think these concerns legitimize the creation of the Ninth Circuit's broad exception to this statute. The statute does contain language which reasonably limits its application; only "material" statements are violations. The false documents here were clearly material to ascertaining the tax liability of Duerr. He was using the false price of the lots to conceal a substantial amount of income. Unlike the mere denial of guilt by a suspect, the government would be very likely to rely on the documents submitted by defendant.

Besides this statutory language, Congress appears to have relied primarily upon the discretion of a prosecutor in limiting the potential application of this section. This mechanism—prosecutorial discretion—is a valid means of limiting the potential application of a statute. It is not our role to re-write a statute simply because we are discomforted by the manner in which Congress chose to structure its enforcement. *United States v. Lambert*, 501 F.2d 943, 946 (5th Cir.1974) (stating that "establishment of different policies for the governmental agencies affected [in order to curb overzealous application of section 1001] is in the executive and legislative rather than the judicial domains"); *cf. United States v. Schmoker*, 564 F.2d 289,

---

7. Some Ninth Circuit panels have begun to question the usefulness of this multi-part test. *See Alzate–Restreppo*, 890 F.2d at 1068 (Patel, J., and Nelson, J., concurring in the judgment) (stating that the five-prong test is "cumbersome" and that it "is unnecessary and distortive"). Judge Patel suggests an analysis based on "whether, at the time of the statement, there was reasonable cause to detain or probable cause to arrest the defendant or whether he was the subject of a criminal investigation." In such circumstances, which implicate fifth amendment concerns, a negative response should not violate section 1001. *Id.* at 1069–70. However, fifth amendment concerns have led courts to reach different conclusions. *Compare United States v. King,*

613 F.2d 670 (7th Cir.1980) (holding that the exculpatory no exception did not apply once defendant had been read his *Miranda* rights, an act informing him that he was under investigation) *with Alzate–Restreppo*, 890 F.2d at 1069 (Patel, J., and Nelson, J., concurring in the judgment) (discussing cases which have held that the exculpatory no exception applies only when a defendant has been read his *Miranda* rights).

We also observe that the third criterion appears superfluous in light of the requirement of materiality. As one judge noted, "[s]ince materiality is a critical element of [section 1001], this [third criterion] seems redundant." *Alzate–Restreppo*, 890 F.2d at 1068 (Patel, J., and Nelson, J., concurring in the judgment).

292 (9th Cir.1977) (Hufstedler, J., concurring specially) (stating that "the court is forbidden to intervene when the choice of charges is legally committed to the prosecutor").

### C. Timing of Statement

■ Defendant also argues that the documents were not false statements since they were the documents drawn up at the time of the transactions. However, the statute speaks of documents or writings which contain "any false ... statements ... or entry." These documents contained false entries. They recited a purchase price and payments which did not reflect the actual transaction, but which falsely purported to do so. These statements subsequently were submitted to the IRS by defendant. Hence, these statements fall within the purview of section 1001.

### III.

For the foregoing reasons we AFFIRM the judgment of the District Court.

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the body of the majority opinion, but footnote five prompts me to add a word of explanation as to the point at which I part company with the dissenters.

The dissent suggests that there could have been no violation of the statute without at least an implied representation to Agent Hall that the documents were correct—and the dissent asserts that, "in fact, the defendant did not ... imply that they were correct." I agree that an implied representation was required, but it seems to me that such a representation was, in fact, made. The defendant agreed to put a false price in the sales documents with a view to misleading anyone who read the documents, and in sending the false documents to Agent Hall, as the jury must have found, the defendant intended to mislead Agent Hall. I think the record amply supports the conclusions (1) that the defendant falsified a material fact, (2) that he did so by making a false representation, and (3) that he used a false document in the

process. On the record before us, in my opinion, the defendant's use of the false document constituted a violation of all three of the operative clauses of the statute.

WELLFORD, Senior Circuit Judge, concurring:

I fully agree with the principles enunciated by the majority in this case. I write separately, however, to indicate that under no circumstances should we apply the "exculpatory no" exception to a case in which the person seeking the benefit of this doctrine was not under investigation when the relevant statement was made.

I agree that the "exculpatory no" doctrine's links to Fifth Amendment concerns are weak. Even if I were to accept this rationale for the doctrine, the Fifth Amendment normally applies only when the individual claiming the right is the *subject* of the interrogation. *Cf. Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966) ("Our decision is not intended to hamper the traditional function of police officers in investigating crime.... General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.") (citation omitted); *see also Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The "exculpatory no" doctrine, even if it were legitimately grounded on Fifth Amendment concerns, should have no application in a case such as this since the defendant here was not a suspect at the time he was questioned. *United States v. Myers*, 878 F.2d 1142, 1144 (9th Cir.1988).

In this case the jury had clear evidence that Steele himself helped draft or make, through a scheme with Duerr, a false statement and representation about a sale of property, and then furnished this intentionally false information to IRS agent Hall for the purposes of concealing tax consequences to himself and others. We do not decide the issue in this case as to whether Steele may have been liable for furnishing the known false documentation, which he

himself helped draft, to IRS for the sole purpose of protecting others to avoid substantial tax liability. This case involves his attempt to conceal his own fraud and to protect another as well.

In my view, under the circumstances of this case, Steele at least indirectly represented to agent Hall that the documents he furnished accurately described the land transaction. There is no evidence, contrary to mere speculation and surmise, that Hall had any basis himself to know, or even to suspect, that the information furnished was false and fraudulent. There was no evidence that Hall "suspected" Steele at the time to be a deceiver, a fraud participant, and a tax evader. The dissent contends that the "important question should be whether he [Steele] *thought* he was a suspect," but no authority is cited for this proposition. I conclude this is not determinative; rather, the important question is whether Steele by his actions intended to deceive the investigating agent.

Steele's offense under the statute was to falsify and conceal a material fact in an IRS investigation of another person, and to make a knowing false statement or representation in the documentation of a sale. This activity comes within the proscribed language of § 1001 and encompasses the *use* of the false writing.

The dissent virtually acknowledges that its proposed adoption of the "exculpatory no" doctrine would "eliminate situations" through judicial redrafting of § 1001 based on its assumption that Congress did not, despite its use of the broad language, intend to criminalize this type of fraudulent conduct. As stated by Judge Kennedy, "[i]t is not our role to re-write a statute simply because we are discomforted" by congressional language.

BAILEY BROWN, Senior Circuit Judge.

We respectfully dissent.

## I

The overall thrust of the majority opinion is twofold: first, that applying the "plain meaning" of 18 U.S.C. § 1001, the evidence supports a conviction of the defendant, Steele, of a violation of that provision; and second, that without deciding whether some formulation of the "exculpatory no" doctrine could be acceptable, the formulation of the doctrine relied upon by defendant and applied in the Ninth and Fourth Circuits [1] is not acceptable and cannot be applied in this case.

On the contrary, it appears to us that, giving effect to section 1001 by its terms, the evidence does not support a conviction of defendant and that, in any event, the "exculpatory no" doctrine as applied in the Ninth Circuit and Fourth Circuit, should be adopted by this court and applied in this case.

## II

We agree with the majority opinion's statement of the rules of statutory interpretation and application. "Plain meaning" controls unless this will create a result clearly contrary to the intent of those who drafted the statute. We also agree with the majority opinion's summary of the legislative history and agree that, section 1001 being a criminal statute, it must be "construed strictly." *United States v. Bramblett*, 348 U.S. 503, 509, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955). We further agree with the majority opinion that, under the holding in *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), the Internal Revenue Service is a "department or agency of the United States" within the meaning of section 1001, and defendant has not contended otherwise.

## III

### A.

The majority opinion, nevertheless, recognizes that the meaning of section 1001,

1. *United States v. Equihua–Juarez*, 851 F.2d 1222 (9th Cir.1988); *United States v. Cogdell*, 844 F.2d 179 (4th Cir.1988); *United States v. Medina de Perez*, 799 F.2d 540 (9th Cir.1986).

on its face, is not so plain. It states that the provision has:

> [T]hree operative clauses: the first clause prohibits a misstatement of "material" fact; the second clause prohibits a false "statement" or "representation"; and the third clause prohibits false writings containing a false "statement" or "entry." A literal application of this statute requires a finding of materiality in the first clause, and a finding of a "statement" in the second and third clauses with no requirement of materiality. In keeping with prior caselaw, we choose to read the requirement of materiality into all of the clauses so as ' "to exclude trivial falsehoods from the purview of the statute." ' (Citations omitted.)

We agree that, under the statute, only "material" statements or representations or writings could be a basis for a violation of section 1001 and further agree that the documents mailed to IRS Agent Hall were "material" to his investigation.

The majority opinion then concludes that the elements of a section 1001 offense are as follows:

> Accordingly, five elements comprise the section 1001 offense: (1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency. (Citations omitted.)

### B.

At this point, it should be recognized that the majority opinion never specifies the conduct of the defendant that was, applying its definition of elements of the crime, a substantive violation of section 1001. We assume that it is not intended to hold that the mere act of having the documents prepared by counsel and executed by the parties was a violation of section 1001, although the documents were prepared at

Duerr's request to cover up Duerr's income and therefore arguably "pertained to an activity within the jurisdiction of a federal agency." We also assume that the majority opinion does not consider the criminal conduct to be defendant's act of sending the documents to Agent Hall knowing them to be incorrect *and* expressly or impliedly representing to Hall that the documents were correct. We assume this because the majority opinion does not rely on any such expression or implication from the defendant to Hall and because, in fact, the defendant did not express or imply that they were correct. Defendant only agreed to send to Hall the documents that he had in his file and so stated in the letter to Hall that accompanied the documents.[2] We therefore assume that it is the intent of the majority opinion to hold that the act of sending the documents to Agent Hall, at Hall's request, knowing them to be false, was, *ipso facto*, the criminal act.

The only language in the statute that could possibly criminalize the act of sending the false documents to Agent Hall, knowing them to be false, at Hall's request, is that part which states: "Whoever, in any matter within the jurisdiction of any department or agency of the United States ... *uses* any false writing or document knowing the same to contain any false ... statement...." (Emphasis added.) The operative word is "uses." If it cannot fairly be said that defendant "used" the documents when he mailed them to Hall, his act was not criminal. Defendant did not "use" the documents. It was Agent Hall, who desired to see the documents, who contacted defendant by telephone and caused them to be sent to him. It is true that defendant avoided an interview with Hall, but the fact remains that defendant merely complied with Hall's request to supply copies of the documents in defendant's file.

It appears to us that it is an unreasonable interpretation of section 1001, in the

---

2. The letter stated only: "Dear Mr. Hall: Enclosed you will find copies of all the documents which we have in our possession regarding Thomas R. Duerr."

light of the legislative history,[3] to hold that the supplying of a document, at the request of a government agency, that is known to be false is, *ipso facto*, a crime under section 1001. Under the majority opinion, the defendant would have violated section 1001 even if, for example, he had had no interest in the land sale to Duerr and had had no part in the preparation of the documents but, as Duerr's accountant, had had possession of the documents, knew that they were false, and had mailed them to Agent Hall at Hall's request.

It was Agent Hall who initiated the contact, not defendant, and defendant did not represent to Agent Hall that the documents accurately described the land transaction. Moreover, it was Agent Hall's desire to use the documents, not defendant's, that was the reason for their delivery to Hall. The majority opinion cites no case in which section 1001 was applied in the same or similar situation to this one, and the legislative history set out in the majority opinion does not support such an application of section 1001.[4]

The majority opinion appears to recognize, without relying on the doctrine of "exculpatory no," that conduct that would be covered by the "plain meaning" of the statute is not criminalized. The opinion states: "They [i.e. the statements in the documents sent to the IRS] were not spontaneous, emotional disclaimers uttered by a suspect to which an experienced investigator would give little credence and on which one would be unlikely to rely." We agree with the implication that such conduct is not criminalized by section 1001 because, in the light of the legislative history and the concerns Congress intended to meet, it is highly unlikely that Congress intended to

criminalize such conduct. We also believe, however, that the same result would follow for the same reason if a disclaimer were neither spontaneous nor emotional.

The majority opinion agrees with the statement in *United States v. Medina de Perez*, 799 F.2d 540, 543–44 (9th Cir.1986) (quoting *United States v. Bedore*, 455 F.2d 1109, 1110 (9th Cir.1972), that "if read literally, [this statute] could make 'virtually any false statement, sworn or unsworn, written or oral, made to a Government employee ... a felony.'" The answer to this obvious problem in applying the statute is, according to the majority opinion, not that we narrow its application in accordance with legislative history, but rather that we rely on the prosecutors to wisely exercise their discretion and not bring some cases that are covered by the "plain meaning" of the statute. This appears to us to be an ineffective and inappropriate substitute, in this context, for the application of the accepted principle of a strict interpretation of this criminal statute in the light of its legislative history.

## IV

It is the position of the government that defendant was not a "suspect" when he was contacted by Agent Hall and, at Hall's request, supplied him with copies of the documents. In support of its position, the government in its original brief cited pages 41–45 of the transcript and in its brief for the en banc court cited government's exhibit 14 and pages 41–45 of the transcript. Exhibit 14 is the superseding criminal information filed against Duerr after Duerr agreed to cooperate; transcript pages 41–45 are part of the testimony of Duerr as a

---

**3.** As is recognized by the majority opinion, the last substantive amendment to this statute in 1934 was induced by the practice of filing false documents covering shipment of oil in commerce but which caused no loss to the government. It had nothing to do with documents not required to be filed and are furnished to the government at the government's request.

**4.** In concurring in the majority opinion, Judge Wellford and Judge Nelson agree that the defendant "used" the documents only if he impliedly represented to Agent Hall that the documents

correctly stated the facts of the transaction and only if his reason for sending the documents to Hall was personal. It seems to us that there was no implication of correctness here as there would not have been had defendant submitted these partnership documents pursuant to a subpoena. Moreover, the evidence is that the documents would not have been sent by defendant to Hall but for the fact that Hall asked for them. This is a criminal statute, and it is contrary to accepted doctrine to stretch it to cover this fourth count of the indictment.

government witness. Neither this criminal information nor this testimony affords any support for the contention that defendant was not a suspect.

The majority opinion, however, finds other support for the government's contention that defendant was not a suspect when he was contacted by Hall and supplied the documents. The opinion states that it may be inferred that Duerr did not give information to the government until after defendant had supplied the documents to Hall. Even if this may be inferred, however, this does not rule out the possibility that the government had received some information from a source other than Duerr. For example, it appears that the defendant's then partner, Pelphrey, who testified as a government witness in this case, had knowledge at the time of the transaction that the documents did not truthfully reflect it. Pelphrey testified that he knew at that time that the documents did not reflect the $40,000 in cash that Duerr paid on the front end, and Pelphrey put his share of the cash ($19,500) in a safety deposit box. Pelphrey also knew that the partnership return did not reflect the cash payment; nevertheless, Pelphrey's personal return, he testified, did reflect the cash he received. Pelphrey told his wife about this at the time of the transaction. Tr. 263–302. Certainly Agent Hall never testified that neither he nor the IRS nor drug enforcement[5] had any information that implicated defendant until Duerr confessed.

The majority opinion also bases its inference that the defendant was not a suspect on the assertion that, during an argument to the trial court at the conclusion of the government's case, the prosecutor represented to the court that defendant was not a target and "The statement was not challenged." It is difficult, however, to see how defense counsel could have challenged a statement the truth of which only the government would know.

The majority opinion also states that, had Duerr not confessed, it was unlikely that Agent Hall or the IRS would have ever learned the true terms of this land sale. The opinion bases this inference on Hall's testimony that he could not have learned these terms from the defendant's personal tax return, the partnership tax return, and the documents supplied to him by defendant. However, there were other sources of this information such as, as we have stated, the defendant's partners in this land transaction, Pelphrey and Pelphrey's wife, and their personal income tax return on which their share of the cash was reported.

In any case, while the majority opinion does not specify whether defendant's not being a "suspect" undercuts his contention that section 1001 does not cover his conduct or his contention that the doctrine of "exculpatory no" applies, we assume that it is the latter. As will be seen, under the forumlation of the doctrine that we would apply, his being or not being a "suspect" is not a part of the consideration.[6]

V

As is recognized by the majority opinion, the "exculpatory no" doctrine has been adopted by several circuits in various formulations but it is the formulation of the Ninth Circuit, and followed by the Fourth Circuit,[7] that was relied upon by defendant at trial and here. The majority opinion does not hold that the facts of this case do not fit this formulation, and clearly they do fit.[8]

---

**5.** As indicated by the majority opinion, pursuant to statutes relating to illicit drugs, Duerr was originally indicted, along with several others, for conspiracy and substantive violations.

**6.** It appears to us that, if defendant's being a "suspect" should be a factor in the determination whether he can rely on the doctrine of "exculpatory no," the important question should be whether *he thought* he was a suspect, not whether the government considered him a suspect.

**7.** *See, supra* note 1.

**8.** At trial, the district court refused to charge the jury, as defendant requested, concerning defendant's defense based on "exculpatory no." Instead, the court simply charged the jury that plaintiff would be guilty under § 1001 if he "made and used ... a false ... document within the jurisdiction of a department or agency...."

The "exculpatory no" doctrine, as recognized by those circuits and as set out in the majority opinion, consists of five parts, each and all of which must be satisfied if a defendant is to be allowed to rely on the defense:

1) the false statement must be unrelated to a claim to a privilege or a claim against the government;

2) the declarant must be responding to inquiries initiated by a federal agency or department;

3) the false statement must not impair the basic functions entrusted by law to the agency;

4) the government's inquiries must not constitute a routine exercise of administrative responsibility; and

5) a truthful answer would have incriminated the declarant.

The majority opinion refuses to approve this formulation of "exculpatory no" because, it opines, the fourth and fifth criteria are, at least in part, wrongly based on fifth amendment concerns. We believe that to support this "exculpatory no" doctrine it is unnecessary to rely on fifth amendment concerns. We believe that the doctrine can and should be invoked for the reason that (as the majority opinion recognizes) if applied literally, section 1001 would criminalize as a felony every false statement, oral or written, sworn or unsworn, knowingly made to any federal government employee if the statement had to do with a matter within the jurisdiction of the employee's department. We do not believe that, in view of the legislative history, it was the intent of Congress to enact legislation that would sweep that broadly. It appears to us that the "exculpatory no" doctrine as it has evolved in the Ninth Circuit and followed in the Fourth Circuit, fairly eliminates situations that Congress never intended to criminalize. Moreover, by so applying this doctrine, the courts can avoid a case by case *ad hoc* consideration in making a determination whether section 1001, though appearing to apply to a defendant's conduct, actually applies.

The majority opinion also disapproves of this formulation of the "exculpatory no" doctrine because the fourth criterion permits the defense to be applied to criminal investigations but not to a "routine exercise of administrative responsibility." In *Rodgers*, the majority opinion points out, the Court held that section 1001 may be applied in the context of a criminal investigation. The answer to this concern is that, while the "exculpatory no" doctrine cannot be applied to a "routine exercise of administrative responsibility" and *may* be applied in the context of a criminal investigation, it cannot be applied to a criminal investigation unless the other four criteria are satisfied. That is to say, the holding in *Rodgers* that section 1001 was properly applied in the context of that criminal investigation does not infer that the doctrine of "exculpatory no" cannot be applied in the context of a criminal investigation where the other four criteria are met.

## VI

For the reasons stated herein, we respectfully dissent.

MERRITT, Chief Judge, dissenting.

I concur in Judge Brown's dissenting opinion and add this comment with respect to footnote five in the majority opinion. This footnote relates to the dissenting opinion prepared by Judge Brown.

The majority opinion does now make clear that the crime committed here under section 1001 was the "use" of the false documents by mailing them to Agent Hall and impliedly representing that the documents accurately described the transaction. The majority opinion now further concludes that the finding that the documents were "material" amounted to a finding that defendant impliedly represented that the documents accurately described the transaction.[1] This is so, the opinion states, because the documents would not be "material" unless the defendant impliedly represented that the documents accu-

1. The trial court determined that the question of materiality was for the court, not for the jury, and the jury was charged that the documents were "material."

rately reflected the transaction. It appears to me, however, that the documents would have been "material" even if defendant had expressly disavowed such a representation. In short, if defendant had added a sentence to his covering letter to Hall: "I do not represent that these documents accurately describe the transaction," there would, even more clearly, not have been a representation of accuracy and yet the documents would have been "material" to the investigation because they would relate to the investigation of the transaction.

Therefore, it seems to me that the finding of "materiality" does not, by inference, include a finding that the defendant impliedly represented that the documents accurately reflected the transaction. Moreover, and in any event, as is demonstrated by Judge Brown's dissenting opinion, because defendant did not impliedly represent that the documents accurately described the transaction, there is an absence of proof that he "used" the documents within the meaning of 18 U.S.C. § 1001.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

I join with Judge Brown in his persuasive dissent. I write further only to express several personal points concerning this case. Needless to say, I disagree with the majority's conclusion that Steele's conduct was punishable under 18 U.S.C. § 1001. I believe that the facts of this case do not establish a violation of section 1001. In its opinion, the majority fails to specify with any degree of certainty the conduct of the defendant that constituted a violation of section 1001. In failing to do so, the majority has left the public guessing as to what conduct they believe is criminalized by section 1001.

Under our system of taxation, citizens of this country are entrusted with the responsibility of both calculating the amount and paying their income taxes. Our taxation system would be inoperable, as are the tax systems of many other countries in the world, if this were not the case. Under the majority's view of the coverage of section 1001, no careful counselor, be he a certified public accountant or an attorney or even an advisor, will ever advise a taxpayer to do anything unless he can in fact certify to the truth of the documentation being offered to an agent of the Internal Revenue Service. This will needlessly delay, further complicate, and hopelessly snarl, what has been a reasonably effective system of the collection of the taxes in the four states that comprise our circuit.

I also join with Judge Brown in suggesting that the view taken by the Ninth and Fourth Circuits is far more realistic in the world of self-regulation than the position being taken by the majority. I realize that this presents little to convince my colleagues, however, I do feel strongly that with the majority's opinion we are taking a step backwards rather than a step forward.