**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0278n.06
Filed: May 19, 2008

**No. 07-5379**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| AMBROSE ODUNZE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: SUHRHEINRICH, CLAY, and COOK, Circuit Judges.

COOK, Circuit Judge. A person exporting over $10,000 in cash must file a declaration with the Department of Homeland Security ("DHS"). 31 U.S.C. §§ 5316, 5332. A jury acquitted Defendant Ambrose Odunze of attempting to violate that law, but convicted him on two related charges for lying to DHS agents about the quantity of cash he attempted to export. *See* 18 U.S.C. § 1001. On appeal, Odunze argues the government produced insufficient evidence that his false statements were material—a required § 1001 element. Alternatively, he demands a new trial based on remarks jurors made to the trial judge after they reached a verdict. We disagree with both contentions and affirm.

I

DHS agents at Memphis International Airport occasionally screen passengers boarding international flights to ferret out cash smugglers. Stationed in the jetway, the agents randomly select passengers and ask them how much cash they are carrying. If a response arouses their suspicions, the agents pull the passenger to a makeshift examination area—a table in the jetway—to investigate further.

In March 2005 agents stopped Odunze as he boarded a Northwest Airlines flight to Amsterdam. Odunze—headed ultimately to Nigeria with his wife and three children—told an agent that he carried $7,000 in cash, and his wife carried $6,500. The agents responded by guiding Oduzne and his family over to the examination area, where they handed Odunze a Customs form ("503A") that explained the United States' cash-reporting requirements. After allowing Odunze to read the form, the agents asked him to write down how much cash he was carrying. Odunze reported $11,000.

Spotting the discrepancy, the agents instructed Odunze to show them the currency. Odunze replied that his wife had the money in her money belt, at which point she removed the belt from underneath her clothes and displayed $6,500. When the agents demanded to see the rest of the $11,000, Odunze insisted that he carried only an additional $356 in his wallet. To account for his earlier, higher figures, Odunze explained that he referred to money he sent overseas using Western Union. He flashed a Western Union card from his wallet to corroborate this explanation. Prompted

2

by the agents, Odunze then corrected his 503A, crossing out $11,000 and substituting $6,856—the

$6,500 from his wife, plus the $356 in his wallet.

At this point, the agents shepherded Odunze and his family to the main Customs area to

speak with a DHS supervisor, Lorie O'Connor. After telling Odunze he could export as much cash

as he wanted, so long as he declared any amount over $10,000, O'Connor asked Odunze how much

cash he was carrying in total. Odunze maintained that he personally carried only $356.

Unconvinced, O'Connor directed her subordinates to escort Odunze to the bathroom to pat

him down. The search revealed an additional $7,900 stitched into the pockets of the shorts Odunze

wore underneath his pants. Meanwhile, another search yielded $404 from Mrs. Odunze's purse,

bringing the total currency discovered on Odunze and his wife to $15,160. The agents seized the

money (save for $700 to allow the Odunzes to return home) and released the family.

The next day, prosecutors charged Odunze with bulk cash smuggling, 31 U.S.C. §§ 5316,

5332, and three counts of making a false statement to a federal officer, 18 U.S.C. § 1001. Odunze

pleaded not guilty and proceeded to trial. The jury acquitted Odunze of bulk cash smuggling, but

convicted him on two of the three false-statement charges. Specifically, the jury found Odunze

guilty of falsely claiming that (1) he carried $356, and (2) he and his wife together carried $6,856.

The district court sentenced him to concurrent terms of two years' probation (with four months in

home confinement). Odunze now appeals, arguing insufficient evidence supports the jury's guilty

verdicts.

II

"As with other sufficiency-of-the-evidence questions, we determine whether evidence sufficiently supported a § 1001 conviction by deciding 'whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001) (quoting *United States v. Gatewood*, 173 F.3d 983, 988 (6th Cir. 1999)).

Section 1001's five elements are:

(1) the defendant made a statement;
(2) the statement was false or fraudulent;
(3) the statement was material;
(4) the defendant made the statement knowingly and willfully; and
(5) the statement pertained to an activity within the jurisdiction of a federal agency.

*United States v. Steele*, 933 F.2d 1313, 1318–19 (6th Cir. 1991) (en banc); *United States v. White*, 492 F.3d 380, 396 (6th Cir. 2007). Odunze questions sufficiency on the last three elements.

*Materiality*. This court defines a material statement, for § 1001 purposes, as one capable of influencing a government investigation or decision:

> A statement is material for purposes of section 1001 if it has a natural tendency to influence, or be capable of affecting or influencing, a function entrusted to a governmental agency. It is not necessary to show that the statement actually influenced an agency, but only that it had the capacity to do so.

4

*Steele*, 933 F.2d at 1319 (internal citation and quotation marks omitted).

Odunze presses two reasons why his statements to the DHS agents were immaterial. Odunze first contends that, because he personally carried under $10,000 in currency, his false statements did not mask any illegal behavior. Since the law only concerns itself with whether he carried more or less than $10,000, Odunze continues, it mattered not whether he carried $356 or $7,856—either way he had no duty to report.

For support, Odunze points primarily to *United States v. Beltran*, 136 F. App'x 59 (9th Cir. 2005). There a husband and wife tried to cross the Mexican border with a combined $12,177; the wife carried $4,000, the husband (Beltran) $8,177. *Id*. at 61. Though Beltran freely admitted his wife carried $4,000, he declared that he himself only carried $7,000, thus underreporting by $1,177. *Id*. The United States charged Beltran with violating § 1001. The jury found him guilty on that charge, but the Ninth Circuit reversed:

> Because the amount Beltran was actually carrying, $8,177, was below the $10,000 reporting requirement, the only way his statement that he was carrying $7,000 could have been material was if the misstatement . . . was capable of influencing the Customs Agent. There is no record evidence that that was the case . . . .

*Id.* at 61–62.

But here record evidence supports the jury's conclusion that Odunze's misstatements were capable of influencing the DHS agents. Like the Beltrans, the Odunzes carried sums of money that

5

exceeded $10,000 in the aggregate. Unlike Beltran, however, Odunze falsely represented that he and his wife together carried less than $10,000. This raised the possibility that Odunze sought to conceal "structuring"—the breaking up of a large sum of cash into smaller amounts to evade currency reporting requirements. As Agent O'Connor explained at trial, 31 U.S.C. § 5324(c)(3) proscribes gaming the law in this fashion. To borrow O'Connor's example, a passenger cannot evade his duty to report by splitting $20,000 into three pieces, one carried by him and the other two by his co-passengers. O'Connor testified that she asks travelers like Odunze how much money the entire family carries, in part, to probe the possibility of structuring.

In light of Agent O'Connor's testimony, the jury rationally could conclude that Odunze's statements had the capacity to influence whether the agents continued to probe the possibility of structuring. That the government ultimately declined to bring structuring charges against Odunze does not alter our analysis. The test for materiality asks only whether the false statements had the potential to sway the DHS's investigation. *See White*, 270 F.3d at 365 (finding that false statements were material because "the jury could have found that . . . [they] had the capacity to affect the EPA's administrative enforcement of [its] drinking water regulations").

Odunze also approaches the materiality question another way. He claims that his false statements lacked any potential to impact the DHS's investigation because, by the time he uttered them, the DHS agents already suspected he was smuggling cash. Thus, the agents would have searched him before he boarded, regardless of what he did or did not say.

We rejected a similar argument in *United States v. LeMaster*, 54 F.3d 1224 (6th Cir. 1995). There the government accused LeMaster—a state legislator—of taking bribes from an informant in exchange for help with pending legislation. *Id*. at 1226–27. After reviewing tapes that caught LeMaster accepting a $6,000 payment from the informant, the FBI questioned LeMaster. Because he denied accepting any cash, the government added a § 1001 charge. *Id*. at 1226. On appeal from a guilty verdict, this court held that the FBI's knowledge that LeMaster accepted the $6,000 failed to render the false statements immaterial.[1] *Id*. at 1230–31. At that point, the panel reasoned, the agents did not know if LeMaster could explain away any guilt in accepting the money, and his response—whether he admitted to taking the bribe, denied it, or did neither—would guide the FBI's investigation. *Id*. at 1231.

Similarly, though Odunze aroused the DHS agents' suspicions before he made his false statements, the statements had the capacity to assuage those suspicions. Indeed, Odunze accounted for his earlier, discrepant numbers with a good story: he attributed the confusion to his earlier money transfer through Western Union. Though his false statements ultimately failed to dissuade the DHS agents from searching him, the jury rationally could conclude that the statements "had the capacity" to do so. *Steele*, 933 F.2d at 1319.

---

[1]In *LeMaster*, as in other § 1001 cases that preceded *United States v. Gaudin*, 515 U.S. 506 (1995), the district court decided materiality as a matter of law, and this court reviewed de novo.

*Mens rea*. Next, Odunze argues the government failed to establish that he "knowingly and willfully" lied to the DHS agents. 18 U.S.C. § 1001(a). Rather than showing such intent, he urges us to interpret the evidence as demonstrating only his inability—as a non-native English speaker—to correctly understand the DHS agents' questions. Odunze relies on his multiple, contradictory statements—including his initial one indicating he and his wife carried $13,500—to convince us that only a confused man would report over $10,000 and then retract his own statement.

The jury heard all this and concluded, based on ample evidence, that Odunze knowingly and willfully lied. At trial, several DHS agents testified that Odunze—a U.S. citizen who graduated from Wichita State University—registered no problems understanding their questions or following their instructions. This testimony, viewed in the light most favorable to the government, supports the jury's finding that Odunze made his false statements deliberately. *See Steele*, 933 F.2d at 1318–19.

*Jurisdiction*. Finally, though Odunze argues to the contrary, the jury rationally concluded that his false statements pertained to an activity "within the jurisdiction" of the DHS. 18 U.S.C. § 1001(a). "A department or agency has jurisdiction . . . when it has the power to exercise authority in a particular situation." *United States v. Rodgers*, 466 U.S. 475, 479 (1984). The DHS's jurisdiction includes enforcing federal-currency-reporting requirements, *see* 6 U.S.C. § 202(6) (granting the department's Under Secretary for Border and Transportation Security responsibility for "administering the customs laws of the United States"), and Odunze's statement reported the sum of currency he attempted to export.

III

Having rejected Odunze's challenges to the sufficiency of the evidence supporting his

convictions, we now turn to his demand for a new trial. Relying on jurors' remarks to the trial judge

at the trial's end, Odunze contends that certain jurors tainted the verdict by ignoring the trial court's

instructions. But because jurors cannot impeach their own verdict unless they disclose an extraneous

influence or clerical mistake, the district court rightly denied Odunze's motion for a new trial. *See*

Fed. R. Evid. 606(b).

A

The juror statements prompting Odunze's claim emerged when the trial judge met with the

jury after they returned a verdict. As is her custom, Judge Donald went to the jury room to thank the

jurors. In speaking with Judge Donald, the jurors told her that they enjoyed serving and believed that

they reached a just verdict.

Without further prodding, however, the jurors proceeded to make statements that troubled

Judge Donald. As Judge Donald later recounted, one unidentified juror stated that the case proved

particularly difficult because "there were gaps in the proof that the defendant needed to explain, [but]

he didn't rebut the government's evidence, he didn't give us anything to work with." Judge Donald

felt this juror improperly shifted the burden of proof to Odunze.

9

Other jurors relayed their "astonishment" that both the government and the defense failed to grasp that Odunze needed to report money carried by his family members—a conclusion the jurors reached through studying a customs form admitted into evidence. That form—FinCEN 105—defines a person as: "An individual, a corporation, a partnership . . . or other unincorporated organization or group . . . ." According to Judge Donald, the jurors misread the document by reading the word "group" to include a family.

Convinced by these remarks that the jury failed to follow the court's instructions, Judge Donald huddled with the parties the next day. Though she did not recall the jurors, she recounted for the record the previous day's events and pondered whether Odunze deserved a new trial. The prosecutor asked Judge Donald to refrain from issuing any rulings because she was now a witness. Agreeing with this point, Judge Donald transferred the case to another judge in the district.

The new judge—Judge McCalla—denied Odunze's motion for a new trial. Odunze now appeals that ruling, which this court reviews for an abuse of discretion. *Greenwell v. Boatwright*, 184 F.3d 492, 499 (6th Cir. 1999).

B

Save for three narrow exceptions, Federal Rule of Evidence 606(b) forbids using a juror's testimony to impeach a verdict:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.

Rule 606(b) descends from a similar common-law rule, which the federal courts invoked to preserve (1) the finality of verdicts and (2) frank jury deliberations. As the Supreme Court explained long ago, if courts licensed litigants to attack verdicts based upon juror testimony, every defeated litigant would "harrass[] and beset" jurors "in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *McDonald v. Pless*, 238 U.S. 264, 267 (1915). Even worse, if jurors knew their private statements would later face public scrutiny, "frankness and freedom of discussion and conference" in the jury room would suffer. *Id*. at 268.

While the common law generally prohibited jurors from impeaching their own verdict, courts excepted testimony regarding extraneous influences. *See, e.g.*, *Remmer v. United States*, 347 U.S. 227 (1954). Rule 606(b) also codified this exception by permitting juror testimony regarding: (1) "whether extraneous prejudicial information was improperly brought to the jury's attention," and (2) "whether any outside influence was improperly brought to bear upon any juror." Fed. R. Evid. 606(b). Additionally, to guard against clerical errors, a recent amendment to 606(b) now allows testimony regarding "whether there was a mistake in entering the verdict onto the verdict form."

Odunze relies here on juror statements that fall squarely within Rule 606(b)'s ambit, and because the statements speak to how the jurors thought through the case to reach their verdict (and not to any improper external influence), the rule's exceptions provide no relief. *See United States v. Kelley*, 461 F.3d 817, 832 (6th Cir. 2006) (holding that a juror's consideration of the defendants' failure to testify fails to warrant a new trial because "the juror did not learn of the Kelleys' failure to testify through improper channels"); *Gale v. City of Tecumseh*, 156 F. App'x 801, 811 (6th Cir. 2005) ("[E]ven if jurors were confused by the district court's instructions, that confusion does not constitute an outside influence; rather, it involves the mental processes of the jurors. It is, therefore, squarely outside the purview of Rule 606(b).").

Recognizing all this, Odunze attempts to parry 606(b)'s application here on the theory that the jurors did not make the statements in response to "an inquiry"; the jurors spoke spontaneously, he says. Unsurprisingly, Odunze fails to reference any legal authority distinguishing between solicited and spontaneous juror testimony. Since the rule prohibits all juror statements made "*[u]pon* an inquiry into the validity of a verdict," Odunze's argument lacks merit. Fed. R. Evid. 606(b) (emphasis added).

Moreover, our cases confirm that Rule 606(b) treats solicited and unsolicited juror testimony equally. In *United States v. Gonzales,* 227 F.3d 520 (6th Cir. 2000), for example, a jury found the defendant guilty of bankruptcy fraud. Six weeks later, a juror wrote to the trial judge to voice several concerns about the verdict's integrity. *Id*. at 521. The juror relayed statements by other

jurors expressing a cavalier attitude toward finding white collar criminals guilty because they received only "a slap on the hand." *Id*. at 522. Later, at a hearing to probe the letter's allegations, the juror also recalled the foreman saying that the defendant's attorney "always represented guilty clients." *Id*. at 523. Although this juror volunteered the information, this court reversed the district court's order granting the defendant a new trial. Because the jurors shared only their internal thoughts with one another during deliberations, the panel found the statements impotent to impeach the verdict. *Id*. at 526–27.

Because Rule 606(b) similarly bars the juror testimony here from impeaching the verdict, the district court did not abuse its discretion in denying Odunze's motion for a new trial.

IV

For these reasons, we affirm.