**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0455n.06

**No. 17-5496**

<table>
<tr><td rowspan="2">

**UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JOSHUA DONALD EWING,

    Defendant-Appellant.

</td></tr>
</table>

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff-Appellee,        )
                                   )
v.                                 )     ON APPEAL FROM THE
                                   )     UNITED STATES DISTRICT
                                   )     COURT FOR THE EASTERN
JOSHUA DONALD EWING,               )     DISTRICT OF KENTUCKY
                                   )
        Defendant-Appellant.       )          OPINION
                                   )
                                   )

**FILED**
Aug 31, 2018
DEBORAH S. HUNT, Clerk

---

**BEFORE:** **GIBBONS, STRANCH, and BUSH, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.** Joshua Ewing was convicted of distributing a mixture containing heroin and fentanyl, the use of which resulted in the death of Jeremy Deaton, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). He received a mandatory life sentence. On appeal, Ewing challenges his conviction on three grounds: (1) the district court gave internally inconsistent jury instructions, violating Ewing's due process rights; (2) juror misconduct deprived Ewing of his constitutional right to a fair trial and impartial jury; and (3) there is insufficient evidence to support his conviction and "death results" sentencing enhancement. For the following reasons, we find no error and **AFFIRM** on the first two grounds; on the third ground, we **VACATE** Ewing's death results conviction and sentence and **REMAND** to the district court for entry of judgment and resentencing on the lesser included offense of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1).

## I.     BACKGROUND

On May 5, 2016, Joshua Ewing was indicted on one count of distributing a mixture or substance containing heroin and fentanyl, the use of which resulted in the overdose death of Jeremy Deaton, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  Ewing turned down a 15-year plea agreement and proceeded to trial.  At trial, the Government introduced evidence demonstrating that Deaton died of an apparent drug overdose on the morning of February 8, 2016.  Data from a defibrillator implanted years earlier showed that Deaton's heart was beating over 350 times per minute the morning of the overdose and that the defibrillator shocked Deaton's heart three times between 8:07 and 8:17 a.m.  Deaton likely died shortly after the last shock, and his body was discovered in his garage at approximately 10:15 a.m.

Deaton's body was found lying supine on the floor of the garage; one of his sleeves was pushed up, and he had bruising on his arm that was consistent with intravenous drug abuse.  An empty syringe and a burnt spoon were located near his body.  Residue collected from the spoon tested positive for both heroin and fentanyl; the empty syringe did not contain enough material to provide an identification.  John McCarty, the deputy county coroner who responded to the scene, testified that Deaton likely collapsed immediately after using drugs.  No leftover drugs were found in the garage, and the officers did not search Deaton's home beyond that area.

Toxicology tests were performed and revealed the presence of narcotics in Deaton's blood and urine.  Fentanyl, cocaine metabolites (the compounds produced when the body metabolizes cocaine), and low levels of other drugs were found in Deaton's blood.  Fentanyl, fentanyl metabolites, cocaine metabolites, heroin metabolites, and low levels of other controlled substances and their metabolites were found in Deaton's urine.  McCarty recorded Deaton's cause of death as acute combined drug (cocaine and fentanyl) toxicity.

Law enforcement officers who responded to the overdose scene were able to recover and access Deaton's cell phone, including text messages between Deaton and a contact identified as "Josh." Further investigation identified Ewing as the owner of the phone associated with the "Josh" number. The Government introduced these text messages as evidence that Ewing sold Deaton heroin laced with fentanyl the night before Deaton's death. The Government also called Timothy Graul, a Lexington Police narcotics detective assigned to the Drug Enforcement Administration task force, as a witness to interpret what some of the text messages meant. Graul testified that the texts were consistent with a heroin sale and that, based on the messages, a transaction had occurred.

The jury deliberated for over seven hours over the course of two days. After twice indicating that they were unable to reach a decision, the jury returned a unanimous guilty verdict. Several days later, the jury foreperson sent a letter to the district court in an attempt to recant her verdict. The letter set forth several specific allegations of misconduct, including bias and misapplication of the law. Ewing moved for judgment notwithstanding the verdict and, in the alternative, for a new trial. The district court denied the motion without a hearing, determining that there was sufficient evidence to support the jury's guilty verdict and that the allegations in the foreperson's letter were inadmissible to impeach the verdict under Federal Rule of Evidence 606(b). Ewing was then sentenced to a mandatory life term due to the "death results" enhancement and a prior felony drug conviction. *See* 21 U.S.C. § 841(b)(1)(C).

Ewing appeals his conviction, raising three arguments: (1) the court gave inconsistent jury instructions, violating his due process rights; (2) juror misconduct deprived Ewing of his constitutional right to a fair trial and impartial jury; and (3) there is insufficient evidence to support his conviction.

## II.   ANALYSIS

### A.   Jury Instructions

Ewing first argues that his due process rights were violated because the district court gave an internally inconsistent jury instruction regarding the mens rea element of the offense. He concedes that he did not object to the jury instructions below, and we therefore review this challenge under the plain error standard. *See United States v. Castano*, 543 F.3d 826, 833 (6th Cir. 2008).

Instruction No. 12, which borrowed from Sixth Circuit Pattern Jury Instruction 14.02, instructed the jury that they must find the following elements beyond a reasonable doubt to convict Ewing:

> (A) First, the defendant knowingly or intentionally distributed a mixture or substance containing a detectable amount of heroin and fentanyl;
> (B) Second, the defendant knew at the time of the distribution that the substance was a controlled substance;
> (C) Third, death resulted from the use of the mixture or substance containing a detectable amount of heroin and fentanyl.

(R. 30, Jury Instructions, PageID 90) The court further instructed that:

> To prove that the defendant knowingly distributed a mixture or substance containing a detectable amount of heroin and fentanyl, *the defendant did not have to know that the substance contained heroin and fentanyl*. It is enough that the defendant knew it was some kind of controlled substance. Further, the defendant did not have to know how much of the substance containing heroin and fentanyl he distributed. *It is enough that the defendant knew that he distributed some quantity of heroin and fentanyl*.

(*Id.*, PageID 90–91 (emphasis added)) Ewing argues that the two above-emphasized sentences are contradictory, thereby rendering the meaning of "knowingly" ambiguous. Therefore, he argues, the rule of lenity applies, and the instruction must be read to require proof that Ewing "knew that he distributed some quantity of heroin and fentanyl." In the absence of such evidence, he contends, the charge must be dismissed.

"The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). Thus, if 21 U.S.C. § 841 is ambiguous with respect to the knowledge element, Ewing's argument would have merit. This court has repeatedly held, however, that "the government need not 'prove mens rea as to the type and quantity of the drugs' in order to establish a violation of § 841." *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (quoting *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001)).

> The *mens rea* the government must prove is established by § 841(a), which requires nothing more specific than an intent to distribute a controlled substance. Drug type and quantity are irrelevant to this *mens rea* element. . . . [T]he penalty provisions of § 841(b) . . . require only that the specified drug types and quantities be involved in an offense.

*United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014) (citations and internal quotation marks omitted).

Ewing does not argue that our precedent is inapplicable to the "death results" penalty provisions; nor does he provide any authority that, in the absence of statutory ambiguity, an internally contradictory jury instruction would necessitate application of the rule of lenity or give rise to a constitutional violation. Ewing is thus unable to demonstrate plain error and his jury instruction challenge fails.

## B.    Juror Misconduct

Ewing next argues that juror misconduct deprived him of his right to a fair trial and an impartial jury.

Several days after the jury returned a guilty verdict, the foreperson sent a letter to the court and the attorneys in an attempt to "recant [her] verdict." She claimed that the jury's verdict was based on personal bias rather than evidence. The letter included the following allegations of

misconduct: (1) the presence of the victim's family members in the courtroom influenced the foreperson's decision;[1] (2) another juror stated that he had been married to an addict for 12 years but failed to disclose this fact during voir dire; (3) a juror repeatedly stated that the lack of defense witnesses and the inadequate defense lawyering meant that the defendant must be guilty; (4) a juror stated that the Government's burden of proof was a preponderance of the evidence, and the other jurors agreed; and (5) a juror stated that the fact that the Government prosecuted the case in federal court meant that the defendant was guilty. According to the foreperson, it became "very clear" that "the group as a whole did not presume the defendant was innocent until proven guilty," that the jury did not come to the verdict by following the court's instructions, and that the defendant was not given a "fair chance at trial."

Following receipt of the letter, defense counsel moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. The district court denied the motion without holding a hearing, concluding that Federal Rule of Evidence 606(b) barred consideration of the allegations in the letter for purposes of impeaching the verdict.

A district court's decision to deny a motion for a new trial is reviewed under the abuse-of-discretion standard. *See United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012). Federal Rule of Criminal Procedure 33 permits a district court to grant a new trial where "substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). "[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *Id.* (quoting *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)).

---

[1] On appeal, Ewing has abandoned any claim based on the allegation that the foreperson was influenced by the presence of the victim's family members in the courtroom.

On appeal, Ewing argues that the misconduct allegations should have been considered under Rule 606(b)'s exceptions or, in the alternative, that the evidentiary rule must give way to his constitutional rights. We consider these arguments in turn.

### 1. Admissibility Under Rule 606(b)

During an inquiry into the validity of a verdict, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). The rule applies to juror testimony, affidavits, and statements, *id*, and is designed to safeguard juror privacy, enable "honest, candid, [and] robust" deliberations, and protect the finality of verdicts, *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017); *see also Tanner v. United* States, 483 U.S. 107, 120–21 (1987) ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.").

The rule does, however, enumerate certain exceptions:

A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;
(B) an outside influence was improperly brought to bear on any juror; or
(C) a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b)(2). A district court "has an obligation to investigate a colorable claim of external influence on the jury to determine whether any external influence occurred and, if so, whether it was prejudicial." *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) (citing *Remmer v. United States*, 347 U.S. 227, 229–30 (1954)). Distinguishing between external and internal matters, therefore, is critically important.

The "internal processes of the jury generally constitute internal influences." *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998) (citation and internal quotation marks omitted). Examples include: "behavior of jurors during deliberations, the jurors' ability to hear or comprehend trial testimony, and physical or mental incompetence of a juror." *Id.* at 634–35 (citation and internal quotation marks omitted). The "general body of experiences that jurors are understood to bring with them to the jury room" are considered "internal matters" that fall within Rule 606(b)'s prohibition. *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (internal quotation marks omitted). A juror's statement suggesting that the jury misunderstood or misapplied instructions or the law is also typically considered internal and therefore subject to Rule 606(b)'s bar. *See, e.g.*, *United States v. Odunze*, 278 F. App'x 567, 572–73 (6th Cir. 2008) (statements indicating that the jury failed to follow instructions are barred under Rule 606(b)); *United States v. Kelley*, 461 F.3d 817, 830–32 (6th Cir. 2006) (juror's statement that she inferred guilt from the defendants' decision not to testify did not fall within Rule 606(b)'s exceptions); *United States v. Rodriquez*, 116 F.3d 1225, 1226–27 (8th Cir. 1997) (same); *United States v. D'Angelo*, 598 F.2d 1002, 1003–05 (5th Cir. 1979) (juror's statement indicating that the jury misunderstood or misapplied the law was inadmissible under Rule 606(b)).

An extraneous influence, on the other hand, "is one derived from specific knowledge about or a relationship with either the parties or their witnesses." *Herndon*, 156 F.3d at 636. Information "derive[d] from a source external to the jury" is generally "deemed extraneous" and therefore falls within Rule 606(b)'s exceptions. *Warger*, 135 S. Ct. at 529 (internal quotation marks omitted). Examples include a jury's consideration of facts not introduced in evidence (i.e., extra-record facts), a juror's prior business dealings with the defendant, "a juror in a criminal trial who had previously applied for a job in the district attorney's office, a bribe attempt on a juror, and

newspaper articles and media attention." *Herndon*, 156 F.3d at 635 (citations omitted); *see also United States v. Swinton*, 75 F.3d 374, 381 (8th Cir. 1996) (jury's discussion of the defendant's prior conviction, evidence of which had not been introduced at trial, was "extraneous prejudicial information"); *Hard v. Burlington N. R.R.*, 812 F.2d 482, 485–86 (9th Cir. 1987) (juror's knowledge of a party's settlement practices was extraneous), *abrogated on other grounds by Warger*, 135 S. Ct. 521; *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 214–15 (6th Cir. 1982) (testimony that a juror conducted improper experimentation was admissible under Rule 606(b) and required reversal).

Ewing's allegations of juror misconduct fall into two categories: (1) failure to disclose bias during voir dire; and (2) misapplication of law or instructions.

### a. Bias

Ewing argues that a juror lied during voir dire by failing to disclose that he was previously in a long-term relationship with a drug addict. "[A] party may obtain a new trial if he demonstrates that a juror failed to answer honestly a material question on *voir dire*, and that a correct response would have provided a valid basis for a challenge for cause." *Warger*, 135 S. Ct. at 525 (brackets, ellipsis, and internal quotation marks omitted) (quoting *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). The Supreme Court held in *Warger*, however, that Rule 606(b) extends "to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*." *Id.*

*Warger* is instructive. In that case, the plaintiff sued the defendant for negligence after the defendant's truck collided with the plaintiff's motorcycle. *See id.* at 524. During voir dire, plaintiff's counsel "asked whether any jurors would be unable to award damages for pain and suffering or for future medical expenses, or whether there was any juror who thought, 'I don't

think I could be a fair and impartial juror on this kind of case.'" *Id.* (citation omitted). Juror Whipple "answered no to each of these questions." *Id.* Shortly after the jury returned a verdict in favor of the defendant, a juror contacted the plaintiff's attorney and claimed that juror Whipple "had spoken during deliberations about 'a motor vehicle collision in which her daughter was at fault for the collision and a man died,' and had 'related that if her daughter had been sued, it would have ruined her life.'" *Id.* (citation omitted). The plaintiff moved for a new trial, contending that Whipple lied during voir dire about her impartiality. *Id.* at 524–25 (citing *McDonough*, 464 U.S. 548). The Supreme Court held that the juror's affidavit relaying Whipple's alleged statements "falls on the 'internal' side of [Rule 606(b)'s] line: Whipple's daughter's accident may well have informed her general views about negligence liability for car crashes, but it did not provide either her or the rest of the jury with any specific knowledge regarding [the defendant's] collision with [the plaintiff]." *Id.* at 529. Thus, the affidavit was barred under Rule 606(b).

In Ewing's case, the foreperson alleged in her letter that a fellow juror had previously maintained a long-term intimate relationship with an addict, which he failed to disclose during voir dire. Following *Warger*, this allegation falls on the "'internal' side of the line"—the juror's relationship "may well have informed [his] general views [about addiction and drug use], but it did not provide either [him] or the rest of the jury with any specific knowledge regarding" the allegations against Ewing. *Id.* It is, therefore, inadmissible under Rule 606(b).

### b. *Misapplication of Law and Instructions*

The remainder of the misconduct allegations—that jurors applied the wrong standard of proof and improperly inferred guilt from the lack of defense witnesses, allegedly lackluster defense lawyering, and the fact that the case was prosecuted federally—can be characterized as failures to follow, or misapplication of, the law and/or jury instructions.

A juror's failure to follow the law or the district court's instructions is generally an internal matter under Rule 606(b). For example, in *Kelley*, a juror made a statement to a newspaper that he or she was "struck by the fact that neither of the [defendants] testified. If they were innocent, they would have testified." 461 F.3d at 831 (citation omitted). On appeal, this court held that the juror's statement "f[e]ll within the scope of Fed. R. Evid. 606(b)" and that, "because the juror did not learn of the [defendants'] failure to testify through improper channels, a juror's discussion regarding this fact does not fall within either Rule 606(b) exception." *Id.* at 831–32 (capitalization altered). The Eighth Circuit came to a similar conclusion in *Rodriquez*, holding that the jury's consideration of the defendant's failure to testify was not "extraneous information" and therefore was barred under Rule 606(b)). 116 F.3d at 1226–27.

In *Odunze*, a juror's post-verdict statements suggested that the jury had failed to follow the court's instructions and may have improperly shifted the burden of proof to the defendant. 278 F. App'x at 572. On appeal, we held that the statements fell "squarely within Rule 606(b)'s ambit, and because the statements speak to how the jurors thought through the case to reach their verdict (and not to any improper external influence), the rule's exceptions provide no relief." *Id.* at 573. Similarly, in *United States v. Flemming*, the Third Circuit concluded that Rule 606(b) barred inquiry into a juror's statement that "she and her fellow jurors determined that [the defendant] was guilty because he did not meet the burden of proof to convince them he was innocent." 223 F. App'x 117, 123–24 (3d Cir. 2007); *see also United States v. Leung*, 796 F.3d 1032, 1038 (9th Cir. 2015) ("[D]uring a proceeding to set aside a verdict, juror testimony that other jurors engaged in premature deliberations or made up their minds about the case before deliberations began is inadmissible to demonstrate that the jury engaged in flawed processing of the evidence.").

Much like the allegations in *Kelley*, *Rodriquez*, *Odunze*, and *Flemming*, the foreperson's claims that jurors misapplied or failed to follow instructions and the law in Ewing's case fall within Rule 606(b)'s bar—and outside of its exceptions—and are therefore inadmissible to impeach the verdict.

### 2. Constitutionality of Rule 606(b)

Ewing argues, in the alternative, that Rule 606(b)—an evidentiary rule—infringes on his constitutional rights. Collectively, he contends, the misconduct allegations demonstrate that the jury did not afford him a presumption of innocence, lowered and partially shifted the burden of proof, and was biased against him as a federal defendant. To apply Rule 606(b) to bar consideration of these allegations would therefore abridge his constitutional jury trial right.

Legislators are afforded significant latitude in enacting evidentiary rules. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). "This latitude, however, has limits." *Id.* When evidentiary rules "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve," they abridge the defendant's constitutional rights and must give way. *Id.* (citation and internal quotation marks omitted). For example, the Supreme Court has reversed convictions where state evidentiary rules deprived defendants of "a meaningful opportunity to present a complete defense," *id.* at 331 (citation omitted); the right to confront witnesses, *see Davis v. Alaska*, 415 U.S. 308, 319 (1974); and "a trial in accord with traditional and fundamental standards of due process," *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The Supreme Court upheld the constitutionality of Rule 606(b) in *Tanner*. *See* 483 U.S. at 116–17, 120–21, 126–27. *Tanner* involved allegations of drug and alcohol use by several jurors during a criminal trial. *See id.* at 113–16. The Court first held that, "[h]owever severe their effect

and improper their use," voluntary drug or alcohol use by jurors was an internal, rather than outside influence. *Id.* at 122, 125. The Court went on to hold that application of Rule 606(b) did not violate the defendants' Sixth Amendment right to a fair trial before an impartial and competent jury. *Id.* at 126–27. "There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it." *Id.* at 120. The Court emphasized the "other sources of protection of [the defendants'] right to a competent jury," including voir dire; observation of jurors during trial by the court, attorneys, and other jurors; and the admissibility of non-juror evidence of misconduct. *Id.* at 127.

In *Warger*, the Supreme Court reaffirmed its holding in *Tanner*, concluding that "[e]ven if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." 135 S. Ct. at 529. The Court left open the possibility that "[t]here may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged. If and when such a case arises, the Court can consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Id.* at 529 n.3.

In *Pena-Rodriguez*, the Supreme Court recognized an exception to the no-impeachment rule "when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt." 137 S. Ct. at 867. The Court recalled its earlier "admonition . . . that the no-impeachment rule might recognize exceptions in the gravest and most important cases where exclusion of juror affidavits might well violate the plainest principles of justice." *Id.* at 864

(citation and internal quotation marks omitted). In reaching its holding, the Court reasoned that

racial bias is different:

> In the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial. . . .
>
> Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State. . . .
>
> Racial bias of the kind alleged in this case differs in critical ways from the compromise verdict in *McDonald*, the drug and alcohol abuse in *Tanner*, or the pro-defendant bias in *Warger*. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury—or juror—gone off course. Jurors are presumed to follow their oath and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. . . .
>
> The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice.

*Id.* at 867–68 (citations and internal quotation marks omitted). The Court found racial bias to be

"distinct in a pragmatic sense as well," concluding that the safeguards identified in *Tanner* may be

less effective in protecting against it. *Id.* at 868–69.

Rule 606(b), including its exceptions, "is designed to balance the preservation of the

integrity of the jury system and the rights of the defendant." *United States v. Logan*, 250 F.3d 350,

380 (6th Cir. 2001). The challenge, as recognized by the dissent in *Tanner*, is to find the balance

that honors the individual guarantees of our Constitution without undertaking "efforts to perfect"

the jury system that instead destroy it. *Tanner*, 483 U.S. at 142 (Marshall, J., concurring in part

and dissenting in part). The Supreme Court has chosen to place the fulcrum at a point that protects

jury dynamics and the finality of verdicts. Its precedent seeks to assure that the private

deliberations of jurors do not become "the constant subject of public investigation—to the

destruction of all frankness and freedom of discussion and conference." *Id.* at 120 (quoting

*McDonald v. Pless*, 238 U.S. 264, 268 (1915)). The allegations of juror misconduct in Ewing's case are indeed "troubling and unacceptable." *Pena-Rodriguez*, 137 S. Ct. at 868 (citation omitted). But they do not fall into the exception for racial bias, *see id.* at 867, nor do they rise to the extreme level contemplated in *Warger*, *see* 135 S. Ct. at 529 n.3. Considering the limitations of binding precedent and the specific circumstances of this case, application of Rule 606(b) to Ewing's case is not unconstitutional.

### C.     Sufficiency of the Evidence

Finally, Ewing argues that there is insufficient evidence to support the jury's guilty verdict. Ewing raised this argument before the district court in his motion for judgment of acquittal; we therefore review it de novo. *See United States v. Lowe*, 795 F.3d 519, 522 (6th Cir. 2015). When evaluating a sufficiency challenge, we view the evidence in the light most favorable to the Government and ask whether it is sufficient to permit any rational juror to find the defendant guilty beyond a reasonable doubt. *See id.* "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (citation omitted).

To sustain Ewing's "death results" conviction, the Government must prove: (1) "knowing or intentional distribution of heroin [and fentanyl]"; and (2) "death caused by ('resulting from') the use of that drug." *Burrage v. United States*, 571 U.S. 204, 210 (2014). To satisfy the second element, the Government must prove that use of the drug distributed by the defendant was "a but-for cause of the victim's death." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015).

Ewing's sufficiency challenge presents three main arguments: (1) there is insufficient evidence that Ewing sold drugs to Deaton on the night before Deaton's death; (2) there is insufficient evidence that fentanyl was a but-for cause of Deaton's overdose death; and (3) even if

there is sufficient evidence that Ewing sold drugs to Deaton that night and that fentanyl was a but-for cause of Deaton's death, there is insufficient evidence that Ewing sold Deaton the drugs that caused Deaton's death.

### 1.      Whether Ewing Sold Drugs to Deaton

The text messages exchanged between Deaton and "Josh" indicate that Deaton was interested in buying drugs and that Josh had some "KILLA" to sell—a term Detective Graul interpreted to mean particularly potent drugs.  The two men discussed price, quantity, and a meeting place—"BP."  Deaton later texted that he was early because he had to stop by an ATM and was also getting gas.  Bank records revealed that Deaton withdrew money from an ATM across from a BP gas station that night.  Josh later warned Deaton to use less than the "usual amount" due to the drug's potency.

The Government also introduced evidence linking Ewing to the phone associated with "Josh's" number and therefore to the transaction:  the contact in Deaton's phone was listed as "Josh," records showed that Ewing owned that phone, and the messages themselves suggest a level of familiarity between the two men and possible past dealings.  Graul also testified that drug dealers tend to be "very protective" of their phones and that it was "extremely unlikely" that Ewing would have allowed someone else to access or use his phone.  The evidence as a whole is sufficient to permit a rational juror to conclude that a drug transaction actually occurred the night before Deaton's death and that Ewing was the dealer.

### 2.      Whether Fentanyl Was a But-For Cause of Deaton's Death

In *Burrage*, the Supreme Court held that

> at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury.

-16-

571 U.S. at 218–19. Evidence that the drug merely contributed to the victim's death is insufficient, *id.* at 216, but, "where use of the controlled substance 'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance," but-for causation exists, *Volkman*, 797 F.3d at 392 (quoting *Burrage*, 571 U.S. at 211). *Burrage* did not address whether evidence that the drug in question was an independent, sufficient cause of death would be legally adequate—even if the drug was not a but-for cause of death—but this court has held in an unpublished opinion that it is. *See United States v. Allen*, 716 F. App'x 447, 450 (6th Cir. 2017) (recognizing two ways to establish causation "under § 841(b)(1)(C): one can provide drugs that are either an independent, sufficient cause of the victim's death or a but-for cause").

The evidence introduced at trial strongly demonstrates that fentanyl was an independent, sufficient cause of Deaton's death. Toxicology testing revealed that Deaton had 16.8 nanograms per milliliter of fentanyl in his blood; the therapeutic level is between 1 and 3 nanograms per milliliter. Multiple witnesses testified that blood levels provide a more recent history of drug use than urine levels and are more useful in determining whether the drug had a toxic or lethal effect on the person. The presence of fentanyl in Deaton's blood, therefore, indicates recent use, and the high level suggests that the use was lethal. Michael Ward, an adjunct professor retired from the Kentucky Medical Examiners Toxicology Lab, testified that 16.8 nanograms per milliliter of fentanyl was a lethal level in any individual, regardless of tolerance, and that there is "no question that the fentanyl was, in fact, the cause of [Deaton's] death." Ewing's own expert witness, Dr. David Feola, testified that Deaton's fentanyl level was "absolutely" a potentially lethal dose.

The evidence, viewed in the light most favorable to the Government, also permits a jury to find that fentanyl was a but-for cause of Deaton's death. The death certificate listed cocaine and

fentanyl toxicity as the cause of death, and there was testimony indicating that cocaine can cause heart issues and that the cocaine metabolite level in Deaton's blood could have been "potentially" fatal. But there was also expert testimony that, in the event of a cocaine overdose, one would expect cocaine, not just cocaine metabolites, to be present in the decedent's blood. Ewing's expert witness agreed, testifying that it was much less likely that cocaine played a role in Deaton's death because there was no active cocaine concentration in his blood. The jury was free to credit these opinions and conclude that fentanyl was a but-for cause of Deaton's death. *See Volkman*, 797 F.3d at 394.

In sum, there was sufficient evidence to support the jury's finding that fentanyl caused Deaton's death—either as an independent and sufficient cause or as a but-for cause.

### 3. Whether Ewing Sold the Drugs that Caused Deaton's Death

To sustain Ewing's death results conviction, the Government must also prove that the drugs sold by Ewing were the same ones that caused Deaton's death. Ewing contends that the Government did not meet its burden because (1) there is insufficient evidence that Ewing sold heroin laced with fentanyl, rather than cocaine or some other drug, to Deaton; and (2) even if Ewing sold Deaton heroin with fentanyl, there is insufficient evidence that it caused Deaton's death.

The Government introduced evidence that the drug transaction between Ewing and Deaton involved heroin laced with fentanyl. Detective Graul testified about the increasing prevalence of heroin and heroin laced with fentanyl in the area. He explained that he could not remember any case involving pure heroin and that all the heroin he had seen in recent years "ha[d] been cut with fentanyl or something similar." He also testified that the terms, quantity, and price discussed in the text messages between Deaton and Ewing were consistent with a heroin transaction, including

heroin laced with fentanyl. For instance, the $170 per gram price is consistent with heroin, which is commonly sold for between $150 and $200 per gram. That testimony also indicated that the drug Ewing sold was probably not another substance, such as cocaine. Heroin is commonly sold in gram or half gram quantities; cocaine, on the other hand, is more commonly referred to in ounces or "eight balls," referring to an eighth of an ounce, and has a fairly consistent price of approximately $100 per gram. Thus, viewing the evidence in the light most favorable to the Government, there is sufficient evidence to permit a reasonable jury to find that the drug sold by Ewing to Deaton was heroin laced with fentanyl.

There is, however, an unexplained gap in the evidence with respect to Deaton's heroin use that calls into question whether the fentanyl that caused Deaton's death was from the mixture of heroin and fentanyl that Ewing sold to him.

The evidence demonstrated that Deaton collapsed immediately after using drugs at about 8 a.m. and died shortly thereafter. Deaton's defibrillator shocked his heart three times between 8:07 a.m. and 8:17 a.m. and recorded a heart rate of over 350 beats per minute. Detective Graul testified that he believed the drug use that caused Deaton's overdose death occurred at approximately 8 a.m., and Deputy Coroner McCarty opined that Deaton "had used the drug and had immediately collapsed." Deaton had a lethal level of fentanyl in his blood, which indicates that he used fentanyl—either alone or mixed with another drug—at approximately 8 a.m., and it was this fentanyl that caused his death.

The jury heard expert testimony from both the Government and Ewing that the presence of a drug or its metabolites in a person's blood indicates whether that person used that drug in the immediate past. According to Ward, "[t]he blood, as you analyze it, will give you a more recent history of ingestion." In contrast, the presence of a drug or its metabolite in the urine shows only

past or historical use and, unlike blood test results, does not reveal immediate past use. McCarty testified that drugs found in the urine have "been in the body long enough to move into the urine, which is not immediate"; Ward added that urine tests give "a historical perspective" and that substances ingested two or three days earlier can still show up in one's urine.

Toxicology test results showed that fentanyl and fentanyl metabolites were present in Deaton's blood, along with cocaine metabolites. Heroin metabolites were found in Deaton's urine, but his blood contained neither heroin nor heroin metabolites. The absence of heroin itself in Deaton's blood would not necessarily undermine the Government's case, given the drug's fast half-life, but the absence of any heroin metabolites in Deaton's blood rendered it highly unlikely that he had used heroin "in the several hours before his death." According to Dr. Feola, if Deaton had used heroin within a few hours of his death, "it would be much more likely" that morphine and 6-Monoacetylmorphine, the two tested-for heroin metabolites, would have been present in his blood. The absence of those metabolites rendered it "much more likely that [Deaton's] heroin ingestion was not around the time of [his] death."

The Government did not present any evidence to rebut Feola's testimony or to otherwise explain the absence of heroin or heroin metabolites in Deaton's blood. And the testimony of the Government experts—that urine reveals only historical use, while blood reveals more recent use— supports Feola's conclusion that Deaton had not used heroin in the several hours immediately before his overdose death. It is during that time frame, according to the Government's other evidence, that Deaton used the drugs that caused his death. In the absence of any evidence explaining this inconsistency, the jury lacked sufficient evidence to conclude beyond a reasonable doubt that the heroin mixture sold by Ewing contained the fentanyl that caused Deaton's death.

The other evidence relied on by the Government does not alter this conclusion. The spoon recovered from the workbench near Deaton's body contained both heroin and fentanyl residue, indicating that Deaton had likely used that spoon to heat both drugs. It does not, however, tell us or the jury whether the residue accumulated because Deaton used the spoon to heat a substance that contained both drugs or whether he had used the spoon at some point to heat each drug separately, leaving residue from both. Deaton had a history of drug abuse and evidently had been using the spoon to cook narcotics. He had multiple drugs in his system, including cocaine, which the Government does not contend came from Ewing, so while no evidence of a subsequent drug transaction was presented, Deaton clearly had access to other illicit substances in the days and hours before his overdose death.

It is of course true that the evidence "need not remove every reasonable hypothesis except that of guilt" to support a conviction, *Barnett*, 398 F.3d at 522 (citation omitted), but the absence of heroin or heroin metabolites in Deaton's blood and the lack of any evidence or testimony to explain its absence leaves us unable to conclude that the jury's verdict as to the death results enhancement is supported by sufficient evidence.

However, as discussed above, there is sufficient evidence that Ewing sold Deaton heroin laced with fentanyl in violation of the lesser-included offense of distribution of a controlled substance. *See* 21 U.S.C. § 841(a)(1); *Burrage*, 571 U.S. at 210 n.3 ("Violation of § 841(a)(1) is thus a lesser included offense of the crime charged in count 2 [the unlawful distribution of a Schedule I or II drug that results in death, § 841(a)(1), (b)(1)(C)]. It is undisputed that [the defendant] is guilty of that lesser included offense."); *United States v. Burrage*, 747 F.3d 995, 998 (8th Cir. 2014) (reversing the defendant's conviction following remand from the Supreme Court,

and remanding to the district court to "enter judgment on the lesser included offense of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1)" and for resentencing).

We therefore vacate Ewing's death results conviction and remand to the district court to enter judgment on the lesser-included offense of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) and for resentencing. *See Rutledge v. United States*, 517 U.S. 292, 306 (1996) (noting that "federal appellate courts appear to have uniformly concluded that they may direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense"); *United States v. Ward*, 37 F.3d 243, 250–51 (6th Cir. 1994) (reversing a continuing criminal enterprise conviction and remanding for resentencing on the merged conspiracy count); *see also United States v. Hickman*, 626 F.3d 756, 770–71 (4th Cir. 2010) ("Because we conclude that the record contains sufficient evidence to persuade a rational fact finder beyond a reasonable doubt of [the defendant's] guilt on the lesser included offense of conspiracy to distribute one hundred grams or more of heroin, we direct entry of judgment against [the defendant] under Count I of the indictment for conspiracy to distribute and to possess with intent to distribute heroin in the amount of one hundred grams or more.").

## III. CONCLUSION

For the reasons explained above, we **AFFIRM** the district court on Ewing's jury instruction and juror misconduct challenges, **VACATE** Ewing's death results conviction and sentence, and **REMAND** to the district court for entry of judgment and resentencing on the lesser-included offense of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1).